IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REPORTERS COMMITTEE FOR FREEDOM )
OF THE PRESS and ASSOCIATED PRESS, )
                                     )
       Plaintiffs,                       )
                                      )
       v.                                )    Civ. A. No. 1:15-cv-01392-RJL
                                      )
FEDERAL BUREAU OF            )
INVESTIGATION, *et al.,*        )
                                      )
       Defendants.                    )
                                      )

## **DECLARATION OF DAVID M. HARDY**

I, David M. Hardy, declare as follows:

(1)    I am the Section Chief of the Record/Information Dissemination Section

("RIDS"), Records Management Division ("RMD"), at the Federal Bureau of Investigation in

Winchester, Virginia.  I have held this position since August 1, 2002.  Prior to joining the

Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant

Judge Advocate General of the Navy for Civil Law.  In that capacity, I had direct oversight of

Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy.

From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various

commands and routinely worked with FOIA matters.  I am also an attorney who has been

licensed to practice law in the State of Texas since 1980.

(2)    In my official capacity as Section Chief of RIDS, I supervise approximately 233

employees who staff a total of  ten (10) Federal Bureau of Investigation Headquarters

("FBIHQ") units and two (2) field operational service center units whose collective mission is to

effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA, as amended by the OPEN Government Act of 2007 and the OPEN FOIA Act of 2009; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and other Presidential and Congressional directives.  My responsibilities also include the review of FBI information for classification purposes as mandated by E.O. 13526, 75 Fed. Reg. 707 (2010), and the preparation of declarations in support of claims asserted under Exemption 1 of the FOIA, 5 U.S.C. § 552(b)(1).  I have been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to E.O. 13526, §§ 1.3 and 3.1. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to Plaintiffs' requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552.  Specifically, I am aware of the FBI's handling of the Plaintiffs' FOIA requests at issue in this case, and discussed further below.

(4)     In response to Plaintiffs' requests, the FBI processed a total of 267 responsive pages.[1]  Of the processed pages, 83 pages were released in full, 103 pages were released in part, 59 pages were withheld in full pursuant to applicable FOIA exemptions and 22 pages were withheld in full as duplicates.[2]  In accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir.

---

[1] In addition, to the processed responsive pages, the FBI advised the Plaintiffs' that additional responsive records could be located online at the following link:
http://dojnet.doj.gov/criminal/ccips/online/library/DOJ%20Memoranda/AG-FBI%20Undercover%20Operations.pdf.  The document contained at this link is "The Attorney General's Guidelines on Federal Bureau of Investigation Undercover Operations."

[2] It is the policy of the FBI to withhold duplicate pages in order to speed the processing of requests and reduce duplication costs for requesters.  For purposes of this litigation, a deleted page sheet has been inserted in the location

1973), this declaration is being submitted in support of Defendant's motion for summary

judgment in order to provide the Court and Plaintiffs with an explanation of the FBI's

recordkeeping system, the procedures used to search for, review, and process the responsive

records, and of the FBI's justifications for withholding information in full or in part pursuant to

FOIA Exemptions 1, 3, 5, 6, 7(C), and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(3), (b)(5), (b)(6),

(b)(7)(C), and (b)(7)(E).

## ADMINISTRATIVE HISTORY OF PLAINTIFFS' FOIA REQUESTS

### FOIA Request Numbers 1313500-000 and 1313504-000

(5)     By letter dated November 6, 2014, Raphael Satter, a news correspondent with the

Associated Press, submitted a FOIA request to FBI Headquarters ("FBIHQ"), Records

Management Division ("RMD"), in Winchester, Virginia, and to the FBI Seattle Field Office's

Public Affairs Specialist seeking:

> -Any documents referring to the decision to create the fake AP news article in the
> Timberline High School case. In particular, I seek correspondence between the
> FBI's Seattle office and FBI headquarters about the case. I also seek a copy of
> the internal review carried out by the FBI and a copy of the Web link sent by the
> FBI to suspect in 2007.
>
> -An accounting of the number of times, between Jan. 1, 2000 and Nov. 6 2014,
> that the Federal Bureau of Investigation has impersonated media organizations or
> generated media-style material (including but not limited to emails, webpages or
> links) to deliver malicious software to suspects or anyone else caught up in an
> investigation
>
> -Any documents _ including training material, reviews and policy briefings _
> dealing with the creation and deployment of bogus news stories or media-style
> material in an investigative context.

(6)     In addition, the request sought expedited processing and waiver of all search,

review and duplication fees. (*See* **Exhibit A**.)

(7)     By separate letters, both dated December 1, 2014, the FBI acknowledged receipt

of the duplicate pages citing the original pages to which the duplicates correspond.

of Mr. Satter's request and advised him it assigned FOIPA Request Number 1313500-000 to

address the 1st part of his request and FOIPA Request Number 1313504-000 to address the 2nd

and 3rd parts of his request. The FBI further advised it was searching the indices to the Central

Records System for information responsive to his request; his request for a fee waiver was being

considered; and the status of his request could be checked on www.fbi.gov/foia. (*See* **Exhibit

B.**)

(8)     By separate letters, both dated December 8, 2014, the FBI advised the requester

he had provided sufficient information concerning the statutory requirements permitting

expedition in accordance with 28 C.F.R. § 16.5(d)(1)(iv)[3]; therefore, it was granting his request

for expedited processing concerning FOIPA requests number 1313500 and 1313504. (*See*

**Exhibit C.**)

(9)     By letter dated December 10, 2014, the FBI advised the requester his FOIPA

Request Number 1313500-000 would be closed administratively because the material responsive

to this request was processed in another request, FOIPA No. 1313504-0. The FBI also advised

Mr. Satter he could appeal this response by filing an administrative appeal, by mail or online,

with the Department of Justice ("DOJ"), Office of Information Policy ("OIP") within sixty (60)

days from the date of its letter. (*See* **Exhibit D.**)

(10)     By letter dated December 11, 2014, the FBI advised the requester he met the

statutory requirements for a fee waiver and therefore, granted his request for a fee waiver for

FOIPA request number 1313504. (*See* **Exhibit E.**) The FBI will not charge either of the

plaintiffs any fees for the FBI's processing of the FOIA requests at issue in this case.

(11)     By email dated February 9, 2015, the requester contacted the FBI FOIPA

---

[3] 28 C.F.R. § 16.5(d)(1)(iv): "A matter of widespread and exceptional media interest in which there exist possible
questions about the government's integrity which affect public confidence."

4

Information Officer and asked questions relating to the combining of FOIPA 1313504 and 1313500 and to advise the FBI of his correct mailing address.  (*See* **Exhibit F**.)

(12)    By email dated February 9, 2015, the FBI Public Information Officer responded to Mr. Satter's questions and advised that his change of address would be noted in the request. (*See* **Exhibit G**.)

(13)    By letter dated June 2, 2015, Brian Barrett, Esquire, Corporate Counsel for the Associated Press submitted an appeal to DOJ/OIP, concerning FOIPA Numbers 1313500-000 and 1313504-0, arguing the FBI failed to meet its legal obligation to disclose information requested within the twenty-day statutory time period.  (*See* **Exhibit H**.)

(14)    By separate letters, both dated July 7, 2015, OIP acknowledged receipt of Mr. Barrett's appeal concerning FOIPA Numbers 1313500 and 1313504 and assigned the appeals, appeal numbers AP-2015-04138 and AP-2015-04139.  (*See* **Exhibit I**.)

(15)    By letter dated August 21, 2015, OIP advised Mr. Barrett the DOJ regulations provide for an administrative appeal to OIP only after there has been an adverse determination by a component.  It further advised that since no adverse determination had yet been made by the FBI, there was no action for the office to consider on appeal.  Finally, for Request No. 1313500, OIP advised it opened Appeal No. AP-2015-04138, but it was administratively closing the appeal as the FBI closed request 1313500 and consolidated it with request 1313504.  (*See* **Exhibit J**.)

## FOIA Request Numbers 1319113-000 and 1319138-000

(16)    By letter dated October 31, 2014, Adam Marshall and Hannah Bloch-Wehba, on behalf of the Reporters Committee for Freedom of the Press ("RCFP"), submitted  a FOIA request to FBIHQ, RMD, in Winchester, Virginia, requesting access to and copies of all records concerning the FBI's guidelines and policies concerning undercover operations or activities in

5

which a person may act as a member of the news media, including, but not limited to, the guidelines and policies relating to the criminal and national security undercover operations review committees and the Sensitive Operations Review Committee; guidelines and policies concerning the use of investigative methods targeting or affecting the news media, including, but not limited to, sensitive Title III applications; and all guidelines and policies concerning sensitive investigative matters involving the activities of the news media or relating to the status, involvement, or impact of an investigation upon the news media. In addition, the request sought expedited processing and waiver of all search, review and duplication fees. (*See* **Exhibit K.**)

(17)     By a second letter dated October 31, 2014, Adam Marshall and Hannah Bloch-Wehba, on behalf of RCFP submitted another FOIA request to FBIHQ, RMD, in Winchester, Virginia, requesting access to and copies of all records concerning the FBI's utilization of links to what are, or appear to be, news media articles or news media websites to install data extraction software, remote access search and surveillance tools, or the "Computer and Internet Protocol Address Verifier" ("CIPAV"). In addition, the request sought expedited processing and waiver of all search, review and duplication fees. (*See* **Exhibit L.**)

(18)     By separate emails, both dated November 3, 2014, the FBI Public Information Officer acknowledged receipt of both October 31, 2014 requests. He further advised requests for fee waivers and expedited processing would be addressed once the requests had been assigned a FOIPA request number. In addition, he advised that information regarding the Freedom of Information Act/Privacy is available at http://www.fbi.gov/ or http://www.fbi.gov/foia/. (*See* **Exhibit M.**)

(19)     By email dated December 22, 2014, the FBI contacted Hannah Bloch-Wehba and asked her to provide additional copies of the following FOIPA requests:

6

-Agents Acting as News Media

-FBI's Use of Media Links to Install Data Extraction Software

(20)     Later that day, Hannah Bloch-Wehba responded and provided an additional copy

of each FOIPA request.  (*See* **Exhibit N**.)

(21)     By separate letters, both dated January 7, 2015, the FBI acknowledged receipt of

both requests and advised it assigned FOIPA Request Number 1319113-000 to the request

seeking FBI's guidelines and policies concerning undercover operations or activities where a

person may act as a member of the news media.  The FBI further advised it assigned FOIPA

Request Number 1319138-000 to the request seeking records concerning the FBI's utilization of

links to what are or appear to be news media articles or news media websites to install data

extraction software, remote access search and surveillance tools, or the CIPAV.  The FBI further

advised it was searching the indices to the Central Records System for information responsive to

her requests; that her requests for a fee waiver were being considered; and the status of her

requests could be checked on www.fbi.gov/foia.  (*See* **Exhibit O**.)

(22)     By separate letters, both dated January 8, 2015, the FBI advised the requester she

did not provide sufficient information concerning the statutory requirements permitting

expedition per 28 C.F.R. § 16.5(d)(1)(ii)[4]; therefore, her requests for expedited processing were

denied.  (*See* **Exhibit P**.)

(23)     On or after January 16, 2015, the FBI's letters dated January 8, 2015 concerning

the denial of expedited processing were returned by the United States Postal Service marked

"RETURN TO SENDER-VACANT-UNABLE TO FORWARD."  (*See* **Exhibit Q**.)

(24)     By email dated February 10, 2015, the FBI contacted Ms. Bloch-Wehba to advise

---

[4] 28 C.F.R. § 16.5(d)(1)(ii): "An urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information."

correspondence sent to her had been returned to our office marked as "RETURN TO SENDER-VACANT-UNABLE TO FORWARD." Later that same date, Ms. Bloch-Wehba responded to the email, advising the Reporters Committee had moved and provided the new mailing address. Following receipt of her response, RIDS personnel re-mailed the letters to the new address. (*See* **Exhibit R**.)

(25)     By letter dated May 18, 2015, the FBI advised a search of the FBI's Central Records System failed to locate any main file records responsive to her FOIPA request number 1319138. Additionally, the FBI advised her if she had any additional information to provide, the FBI would conduct an additional search. Finally, the FBI advised her of her right to appeal the FBI's decision by writing to the DOJ, OIP within sixty (60) days from the date of its letter. (*See* **Exhibit S**.)

(26)     By letter dated June 2, 2015, Adam Marshall and Hannah Bloch-Wehba, on behalf of RCFP submitted an appeal to DOJ/OIP, concerning FOIPA Number 1319113-000, arguing the FBI failed to meet its legal obligation to disclose information requested within the twenty-day statutory time period. (*See* **Exhibit T**.)

(27)     By a separate letter dated June 2, 2015, Adam Marshall and Hannah Bloch-Wehba, on behalf of RCFP submitted an appeal to DOJ/OIP, concerning FOIPA Number 1319138-000, arguing the FBI failed to conduct an adequate search for responsive records. (*See* **Exhibit U**.)

(28)     By separate letters, both dated July 9, 2015, OIP acknowledged receipt of Adam Marshall and Hannah Bloch-Wehba's appeals concerning FOIPA Numbers 1319113-000 and 1319138-000 and assigned the appeals, appeal number AP-2015-04440 and AP-2015-04437. (*See* **Exhibit V**.)

8

(29)    By letter dated August 4, 2015, OIP advised the requester, concerning appeal

number AP-2015-04440, that DOJ regulations provide for an administrative appeal to OIP only

after there has been an adverse determination by a component.  It further advised that since no

adverse determination had yet been made by the FBI, there was no action for the office to

consider on appeal.  (*See* **Exhibit W.**)

(30)    By letter dated August 5, 2015, OIP advised the requester after carefully

considering his appeal, referenced as appeal number AP-2015-04437, it was affirming the FBI's

action on his request.  OIP further advised that the FBI's action was correct and that it conducted

an adequate, reasonable search for records.  In addition, OIP advised the FBI's assertion

indicating it searched the Central Records System was a typographical error.  OIP clarified the

FBI conducted a search of its Operational Technology Division for responsive records.  Finally,

OIP advised him of his right to file a lawsuit in the federal district court if he was dissatisfied

with its action on the appeal; and he could use the mediation services of the Office of

Government Information Services ("OGIS") to help resolve disputes between FOIA requesters

and Federal agencies, and that using OGIS services does not affect his right to pursue litigation.

(*See* **Exhibit X.**)

(31)    On August 27, 2015, Plaintiffs filed their complaint in the instant action.  (*See*

**Docket Number 1**.)

(32)    By separate letters dated February 26, 2016 the FBI made its release of records in

response to Plaintiffs' requests to Brian Barrett, Esquire, Corporate Counsel for the Associated

Press and to counsel of record, Katielynn Boyd Townsend for FOIPA numbers 1313504-000,

1319138-000, and 1319113-000.  The FBI advised 267 pages of records were reviewed and 186

pages of records were being released in full or part, with certain information withheld pursuant to

FOIA Exemptions 1, 3, 5, 6, 7(C), and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E). Plaintiffs were also advised they could appeal the FBI's determination by filing an administrative appeal with DOJ/OIP within sixty days from the date of its letter. (*See* **Exhibit Y**.)

(33)    The FBI provided Plaintiffs' counsel, by letters dated March 28, 2016, a supplemental release of specific Bates pages wherein the FBI either cited additional applicable exemptions to withhold information already marked as withheld pursuant to another applicable exemption or to release additional information. (*See* **Exhibit Z**.)

## ADEQUACY OF SEARCH

(34)    The FBI has employed several mechanisms as part of its search to identify documents responsive to Plaintiffs' requests. As a threshold matter, it is important to note that, due to the specificity of the FOIA requests, not all of the requests lent themselves readily or naturally to the searches that the FBI routinely conducts in response to FOIA requests seeking access to FBI investigative files. Given the number of requests and procedural history in this case, the adequacy of search is discussed below in two (2) separate groupings. Group 1 - Records Pertaining to the Use of Links Appearing as Media Generated, addresses FOIPA Request Number 1319138, seeking:

> -access to and copies of all records concerning the FBI's utilization of links to what are, or appear to be, news media articles or news media websites to install data extraction software, remote access search and surveillance tools, or the "Computer and Internet Protocol Address Verifier" ("CIPAV").

And Group 2 - Records Pertaining to Guidelines, Policies, Training Material, Reviews, Policy Briefings, Accountings and the Timberline High School Case, addresses FOIPA Request Numbers 1313504-000 1313500-000 *(consolidated)* and 1319113-000, seeking:

10

-Any documents referring to the decision to create the fake AP news article in the Timberline High School case. In particular, I seek correspondence between the FBI's Seattle office and FBI headquarters about the case. I also seek a copy of the internal review carried out by the FBI and a copy of the Web link sent by the FBI to suspect in 2007.

-An accounting of the number of times, between Jan. 1, 2000 and Nov. 6 2014, that the Federal Bureau of Investigation has impersonated media organizations or generated media-style material (including but not limited to emails, webpages or links) to deliver malicious software to suspects or anyone else caught up in an investigation.

-Any documents _ including training material, reviews and policy briefings _ dealing with the creation and deployment of bogus news stories or media-style material in an investigative context; and

-Access to and copies of all records concerning the FBI's guidelines and policies concerning undercover operations or activities in which a person may act as a member of the news media, including, but not limited to, the guidelines and policies relating to the criminal and national security undercover operations review committees and the Sensitive Operations Review Committee; guidelines and policies concerning the use of investigative methods targeting or affecting the news media, including, but not limited to, sensitive Title III applications; and all guidelines and policies concerning sensitive investigative matters involving the activities of the news media or relating to the status, involvement, or impact of an investigation upon the news media.

### GROUP 1 - RECORDS PERTAINING TO THE USE OF LINKS APPEARING AS MEDIA GENERATED

(35)     The Plaintiffs' request discussed herein sought access to all records concerning the FBI's utilization of specific links to what appear to be news media articles or news media websites to install data extraction software, remote access search and surveillance tools, or CIPAV.

(36)     The FBI generally conducts an index search of its Central Records System ("CRS") to determine if the FBI has records about particular investigative subjects in response to most FOIA requests. The FBI ordinarily relies on the CRS because it is an extensive system of

records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency. In the CRS, FBI employees record index terms in files that are useful to a particular investigation or that are deemed potentially useful for future investigative/intelligence retrieval purposes, such as names of individuals, organizations, companies, publications, activities, or foreign intelligence matters (or programs). The CRS indices are not a repository for policy related matters, and given its investigative functional nature, the indices do not programmatically or logically contain terms that would lead to records responsive to a request such as Plaintiff's Group 1 request herein.

(37)     Therefore, based on RIDS familiarity and expertise with the FBI's organizational structure and Divisions/Units responsible for the issues raised in Plaintiffs' Group 1 FOIA request, RIDS conducted a targeted search of the specific FBI Headquarters Division likely to possess responsive records.

(38)     **Targeted Search of Specific FBI Headquarter Divisions/Units based upon Plaintiff's request 1319138-000**. RIDS prepared and circulated an Electronic Communication ("EC")[5] to the FBI's Operational Technology Division ("OTD")[6] requesting it conduct a search of database systems, as well as paper and manual files, for records responsive to Plaintiff's request. The EC specifically advised OTD RIDS was seeking records concerning the FBI's utilization of links to what are or appear to be news media articles or news media websites to install data extraction software, remote access search and surveillance tools, or the CIPAV. In

---

[5] An Electronic Communication is a document used to communicate within the FBI in a consistent format that can be uploaded by the originating Division or office, transmitted, and downloaded by recipient Divisions or offices within the FBI's internal computer network.

[6] The Operational Technology Division is the responsible authority for the development and deployment of technology-based solutions to enable and enhance the FBI's intelligence, national security and law enforcement operations.

12

addition, RIDS recommended OTD send an e-mail to each of its employees asking them to

search for all relevant records pertaining to this request. The EC identified examples of agency

records as:

> -All records or communications preserved in electronic or written form,
> including, but not limited to correspondence, documents, data, faxes, files,
> guidance, evaluations, instructions, analysis, memoranda, agreements, notes,
> rules, technical manuals, technical specifications, training manuals or studies;
> -Electronic records maintained on computers or audio or video tapes;
> -Emails;
> -Any other portable media (CD-ROMS, diskettes, etc.); and
> -Other stand alone databases created for the purpose of any particular
> investigation.

(39)    Further, the EC asked that each recipient help identify all potentially responsive

documents, regardless of whether they may be located in their office or elsewhere in the Bureau.

OTD completed the search requested in the EC and advised RIDS that no records responsive to

this request were located within its Division.

(40)    As stated before, RIDS selected OTD because of its responsibilities and functions

within the FBI. Specifically, OTD is the FBI's Division responsible for the deployment and

implementation of the CIPAV, making it the FBI Division reasonably likely to have either

created, implemented, utilized, maintained or reviewed records that would be responsive to the

Plaintiff's request. RIDS determined that no other FBI Divisions or personnel would reasonably

likely possess records responsive to this portion of Plaintiffs' requests.

## GROUP 2 - RECORDS PERTAINING TO GUIDELINES, POLICIES, TRAINING MATERIAL, REVIEWS, BRIEFINGS, ACCOUNTINGS AND THE TIMBERLINE HIGH SCHOOL CASE

(41)    The Plaintiffs' requests discussed herein sought access to all records pertaining to

guidelines, policies, training material, reviews, policy briefings, accountings, documents

referring to the decision to create the fake AP news article in the Timberline High School case,

13

correspondence between the FBI's Seattle office and FBI headquarters about the case, a copy of the internal review carried out by the FBI and a copy of the Web link sent by the FBI to the suspect in 2007. As a practical matter and in RIDS's experience as articulated above, agency policy information and alike records reside with the FBI's Divisions/Units responsible for the implementation and promulgation of those policies or procedures. However, given the nexus to an investigation, records and information sought concerning the Timberline High School investigation would likely be indexed in the CRS.

(42)    In an effort to locate records responsive to Plaintiffs' Group 2 requests, RIDS first conducted a targeted search of those FBI Divisions/Units, reasonably likely to possess records responsive to all portions of Plaintiffs' requests identified in this grouping, and then conducted a search of the FBI's CRS, Sentinel and ELSUR indices for records responsive to the portion of Plaintiffs' request seeking information and records relating to the Timberline High School case.

(43)    **Targeted Search of Specific FBI Headquarter Divisions/Units based upon Plaintiffs' requests 1313504-000, 1313500-000 *(consolidated)* and 1319113-000.**[7] RIDS prepared and circulated an EC to the FBI's Seattle Division (the originating office for the Timberline Investigation), the Office of General Counsel, Discovery Processing Units ("DPU"),[8] the Operational Technology Division ("OTD"), the Behavioral Analysis Unit ("BAU") within the Critical Incident Response Group ("CIRG"),[9] the National Covert Operations Section

---

[7] RIDS located during a search of the FBI's FOIPA Document Processing System ("FDPS") records that had been previously processed and released in response to a FOIA request submitted on behalf of Electronic Frontier Foundation concerning the subject, CIPAV software. Portions of these records were determined to be responsive to Plaintiffs' requests.

   •*FDPS is the internal repository and application utilized by RIDS to process, track, and respond to FOIA and/or Privacy Act ("FOIA/PA") requests received by the FBI.*

[8] The Discovery Processing Units identify information that is relevant and subject to disclosure during the civil discovery process.

[9] The Critical Incident Response Group ("CIRG") was established in 1984 to integrate tactical negotiations, behavioral analysis, and crisis management resources into one cohesive structure to facilitate the FBI's rapid response to critical incidents. They provide expertise in the following fields: Crisis Management, Hazardous device

14

("NCOS") within the Criminal Investigative Division ("CID"),[10] and the Training Division

("TD")[11] requesting each office to conduct a search of database systems, as well as paper and

manual files, for records responsive to Plaintiffs' requests. In addition, RIDS recommended that

each recipient division/unit send an e-mail to each of its employees asking them to search for all

relevant records pertaining to these requests. The EC identified examples of agency records as:

> -All records or communications preserved in electronic or written form, including,
> but not limited to correspondence, documents, data, faxes, files, guidance,
> evaluations, instructions, analysis, memoranda, agreements, notes, rules, technical
> manuals, technical specifications, training manuals or studies;
> -Electronic records maintained on computers or audio or video tapes;
> -Emails;
> -Any other portable media (CD-ROMS, diskettes, etc.); and
> -Other stand alone databases created for the purpose of any particular
> investigation.

(44)    Further, the EC asked that each recipient help identify all potentially responsive

documents, regardless of whether they may be located in their office or elsewhere in the Bureau.

Each of these Divisions/Units tasked reported they completed the requested search and advised

RIDS of the results.

---

disruption, crisis negotiation, behavioral analysis and assessments, strategic information dissemination, tactical and technical operations, ground and air surveillance, aviation support, special events management and rapid deployment logistics.

[10] The Criminal Investigative Division ("CID") coordinates, manages and directs investigative programs focused on financial crime, violent crime, organized crime, public corruption, violation of individual civil rights, drug related crime, and informant matters associated with these investigative areas. Through centralized control, CID guides the investigative efforts of field offices against criminal enterprises and individual federal crimes in continental and territorial United States, as well as, internationally. CID is responsible for devising policy matters and techniques to be used in complicated investigations, as well as for making a continuous review of investigative procedures and programs. In addition, CID maintains top-level liaison with officials in the Department of Justice, as well as other Government agencies and foreign law enforcement officials, on matters under the jurisdiction of the FBI for the purpose of coordinating and resolving major policy matters concerning both criminal cases and civil litigations. Within CID is the National Covert Operations Section ("NCOS"). NCOS provides guidance, administrative oversight and support to budget/financial oversight, as well as policy development and compliance.

[11] The Training Division is the responsible authority on all matters regarding training in the FBI, both internal to the FBI workforce and external to FBI partners. The Training Division maintains the role as advisor or administrator of current and future training solutions for the FBI. All efforts to develop, deliver, or provide training solutions are coordinated through the Training Division and must align with applicable training policies and procedures. The Training Division provides guidance on the development and execution of all training plans, training strategies, and training solutions; it sets training policy; it prioritizes and aligns training to FBI strategic priorities. The Training Division serves as the program manager of all personnel and non-personnel training resources to achieve maximum optimization and support of the FBI's training requirements.

(45)     Specifically, as a result of these targeted search efforts, the FBI was able to locate records responsive to Plaintiffs' requests. RIDS selected each of the listed divisions/units targeted because of its responsibilities and functions within the FBI, making them the reasonably likely FBI Divisions/Units to have either created, implemented, utilized, maintained or reviewed records that would be responsive to the Plaintiffs' requests. RIDS determined that no other FBI Divisions/Units or personnel would reasonably likely possess records responsive to the Plaintiffs' requests seeking non investigatory records.[12]

## EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM

(46)     The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions. The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide.

(47)     The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subject categories. The broad array of CRS file classification categories include types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters. For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number ("UCFN") consisting of three sequential components: (a) the CRS file classification number, (b)

---

[12] The search conducted in response to this search EC included direct communication with the FBI Seattle Field Office Special Agent in Charge of the Timberline High School Investigation.

the abbreviation of the FBI Office of Origin ("OO") initiating the file, and (c) the assigned individual case file number for that particular subject matter.[13] Within each case file, pertinent documents of interest are "serialized," or assigned a document number in the order which the document is added to the file, typically in chronological order.

## THE CRS GENERAL INDICES AND INDEXING

(48)     The general indices to the CRS are the index or "key" to locating records within the enormous amount of information contained in the CRS. The CRS is indexed in a manner which meets the FBI's investigative needs and priorities, and allows FBI personnel to reasonably and adequately locate pertinent files in the performance of their law enforcement duties. The general indices are arranged in alphabetical order and comprise an index on a variety of subject matters to include individuals, organizations, events, or other subjects of investigative interest that are indexed for future retrieval. The entries in the general indices fall into two category types:

> a.  Main entry. This entry pertains to records indexed to the main subject(s) of a file, known as "main file" records. The "main" entry carries the name of an individual, organization, or other subject matter that is the designated subject of the file.
>
> b.  Reference entry. This entry, or a "cross-reference," pertains to records that merely mention or reference an individual, organization, or other subject matter that is contained in a "main" file record about a different subject matter.

(49)     FBI employees may index information in the CRS by individual (persons), by organization (organizational entities, places, and things), and by event (*e.g.,* a terrorist attack or bank robbery). Indexing information in the CRS is based on operational necessity, and the FBI only indexes that information considered relevant and necessary for future retrieval.

---

[13] For example, in a fictitious file number of "11Z-HQ-56789;" the "11Z" component indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI OO of the file, and "56789"is the assigned case specific file number.

17

Accordingly, the FBI does not index every individual name or other subject matter in the general indices.

**AUTOMATED CASE SUPPORT**

(50)    Automated Case Support ("ACS") is an electronic, integrated case management system that became effective for FBIHQ and all FBI Field Offices and Legats on October 1, 1995. As part of the ACS implementation process, over 105 million CRS records were converted from automated systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices. ACS has an operational purpose and design to enable the FBI to locate, retrieve, and maintain information in its files in the performance of its myriad missions and functions.[14]

(51)    The Universal Index ("UNI") is the automated index of the CRS and provides all offices of the FBI a centralized, electronic means of indexing pertinent investigative information to FBI files for future retrieval via index searching. Individual names may be recorded with applicable identifying information such as date of birth, race, sex, locality, Social Security Number, address, and/or date of an event. Moreover, ACS implementation built upon and incorporated prior automated FBI indices; therefore, a search employing the UNI application of ACS encompasses data that was already indexed into the prior automated systems superseded by ACS. As such, a UNI index search in ACS is capable of locating FBI records created before its 1995 FBI-wide implementation to the present day in both paper and electronic format.[15] Currently, UNI consists of approximately 112.5 million searchable records and is updated daily

---

[14] ACS and the next generation Sentinel system are relied upon by the FBI daily to fulfill essential functions such as conducting criminal, counterterrorism, and national security investigations; background investigations; citizenship and employment queries, and security screening, to include Presidential protection.

[15] Older CRS records that were not indexed into UNI as a result of the 1995 ACS consolidation remain searchable by manual review of index cards, known as the "manual indices." A search of the manual indices is triggered for requests on individuals if the person was born on or before January 1, 1958; and for requests seeking information about organizations or events on or before January 1, 1973.

with newly indexed material.

## ACS AND SENTINEL

(52)     Sentinel is the FBI's next generation case management system that became

effective FBI-wide on July 1, 2012. Sentinel provides a web-based interface to FBI users, and it

includes the same automated applications that are utilized in ACS. After July 1, 2012, all FBI

generated records are created electronically in case files via Sentinel; however, Sentinel did not

replace ACS and its relevance as an important FBI search mechanism. Just as pertinent

information was indexed into UNI for records generated in ACS before July 1, 2012, when a

record is generated in Sentinel, information is indexed for future retrieval. Moreover, there is an

index data sharing nexus between the Sentinel and ACS systems whereby components of

information indexed into Sentinel are also replicated or "backfilled" into ACS. In sum, the

Sentinel case management system builds on ACS and shares its operational purpose; Sentinel

provides another portal to locate information within the vast CRS for FBI records generated on

or after July 1, 2012.

## ELECTRONIC SURVEILLANCE INDICES

(53)     The Electronic Surveillance ("ELSUR") indices comprise all records related to

electronic surveillance sought, administered, and/or conducted by the FBI since January 1,

1960.[16] The ELSUR indices include records of (a) targeted individuals and entities of electronic

surveillance pursuant to court order, consensual monitoring, or other authority; (b) owners,

lessors, or licensors of the premises where the FBI conducted electronic surveillance; (c) and

individuals identified as participants or monitored/recorded conversations.

(54)     Since January 1, 1960, FBI Field Offices included in their ELSUR indices – and

---

[16] See Privacy Act Systems of Records Notice JUSTICE/FBI-006; 72 F.R. 3410 (last publication of complete notice).

19

reported to FBIHQ for inclusion in its ELSUR index – the names of all persons whose voices have been monitored through a FBI microphone installation or telephone surveillance. On or about October 9, 1991, the ELSUR indices were automated FBI-wide,[17] and since that time, FBIHQ and all FBI field offices have electronically generated, maintained, modified, and accessed all ELSUR records.

(55)    Similar to the consolidation of all indexed record data from prior automated CRS systems superseded by ACS, the prior automated ELSUR indices also interfaced with ACS upon its implementation in 1995. As a result, the names of monitored subjects by FBIHQ or FBI Field Offices since January 1, 1960 are indexed within, and searchable by, the same UNI application employed to locate CRS records. For clarity, while ELSUR has a distinct legal identity from the CRS as a different Privacy Act System of Records, in terms of function, information from both ELSUR and CRS are indexed and retrieved via index searches of the FBI's two case management systems:  ACS and Sentinel.

(56)    <u>Index Searching Generally</u>. To locate CRS information, RIDS employs an index search methodology. Index searches of the CRS are reasonably expected to locate responsive material within the vast CRS since the FBI indexes pertinent information into the CRS to facilitate retrieval based on operational necessity. Given the broad range of indexed material in terms of both time frame and subject matter that it can locate in FBI files, the automated UNI application of ACS is the mechanism RIDS employs to conduct CRS index searches. If a request seeks records that may have been generated on or after July 1, 2012, the FBI generally conducts an overlapping search of ACS using the UNI application and of Sentinel using the index search capability at the litigation stage to ensure adequacy of the initial CRS index search.

---

[17] Prior to automation, the ELSUR indices consisted of index cards on individuals who had been the subject of a microphone or telephone surveillance by the FBI from 1960.

(57)   <u>CRS Search and Results</u>.  At the litigation stage, RIDS conducted a CRS index search for responsive main and cross-reference records employing the UNI application of ACS. The FBI searched using the name – "Timberline," "Timberline High School" and "Timberline Highschool" – in order to identify files responsive to portions of Plaintiffs' requests and subject to the FOIA.  The FBI's search included a string ("ST") search.[18]  This search located the FBI's main investigative file concerning the Timberline High School investigation.  A page by page review of the investigative file was conducted and did not yield any records not already provided by the Seattle Field Office in response to the earlier Search EC.

(58)   <u>ELSUR Search and Results</u>.  In this case, as the UNI application of ACS and the Sentinel index search also accomplished the task of searching the ELSUR indices for any responsive records.  As noted above, although ELSUR has a different identity from the CRS as a Privacy Act System of Records, the functional task of indexing and retrieving information from both ELSUR and the CRS is accomplished via indexing pertinent information for retrieval in the FBI's ACS and Sentinel case management systems.  *See supra* ¶¶ 53-55.  Accordingly, the same search terms described herein to perform the index search for CRS indexed records were utilized to locate any ELSUR records; however, no ELSUR records were identified as a result of this search.  *See supra* ¶ 57.

(59)   <u>Scope of Search</u>:  The FBI implemented a comprehensive and overlapping search to locate records responsive to all of Plaintiffs' requests.  Specifically, RIDS designed and implemented a search methodology tailored to the nature and scope of responsive records sought in Plaintiffs' requests by separating the requests into two distinct Groups to facilitate adequate searches based on the topics of information sought.  In Group 1, RIDS conducted a targeted

---

[18] An "ST" and/or "string" search means the computer will search the index and return those names whose starting characters match the name entered in the Name field.

search of the FBI Division reasonably likely to possess records responsive to Plaintiff's request for records pertaining to the use of links appearing as media generated. *See supra* ¶¶ 38-40. While in Group 2, RIDS first conducted a targeted search of multiple FBI Divisions/Units reasonably likely to possess records responsive to Plaintiffs' request for records pertaining to guidelines, policies, training material, reviews, policy briefings, accountings and the timberline high school case. *See supra* ¶¶ 43-45. Second, RIDS conducted a search of the CRS, as it is the principal records system searched by RIDS to locate information responsive to FOIA requests for investigative records. The CRS is where the FBI indexes information about individuals, organizations and other subjects of investigative interest for future retrieval. *See supra* ¶ 57. Third, the CRS is the FBI system where records responsive to a portion of Plaintiffs' request would reasonably be found.  Given plaintiffs' request seeks information about the Timberline High School case such information would reasonably be expected to be located in the CRS via the index search methodology.  Fourth, in this case, the ELSUR indices were likewise searched via the UNI application of ACS and an index search of Sentinel to locate any responsive records in ELSUR via the same index search terms used for the CRS search. *See supra* ¶ 58. Collectively, there is no indication from the information located as a result of these searches that responsive material would reside anywhere else, and the records located do not indicate other responsive records exist.  As such, there is no factual basis to conclude additional search efforts would be reasonably calculated to yield responsive records.

## JUSTIFICATION FOR NONDISCLOSURE UNDER THE FOIA

### *Explanation of the Coded Format Used to Describe and Justify Withholdings*

(60)    All documents responsive to Plaintiffs' requests and subject to the FOIA were processed to achieve maximum disclosure consistent with the access provisions of the FOIA.

Every effort was made to provide Plaintiffs with all material in the public domain and with all reasonably segregable non-exempt information in the responsive records. No reasonably segregable, non-exempt portions have been withheld from Plaintiffs. Further description of the information withheld, beyond what is provided in this declaration, could identify the actual exempt information that the FBI has protected. Copies of the pages released in part and in full have been consecutively numbered "RCFP- 1 through RCFP-267" at the bottom of each page. Pages withheld in their entirety (*e.g.*, removed per exemption and duplicates) were replaced by a "Deleted Page Information Sheet" ("DPIS"), identifying the reason and/or the applicable FOIA exemptions relied upon to withhold the page in full, as well as Bates numbers for the withheld material. The DPISs and Bates-numbered pages withheld in part have been provided to Plaintiffs' counsel and will be made available to the Court upon request. The exemptions asserted by the FBI as grounds for non-disclosure of portions of documents are FOIA exemptions 1, 3, 5, 6, 7(C), and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).

(61)     The Bates-numbered documents contain, on their face, coded categories of exemptions detailing the nature of the information withheld pursuant to the provisions of the FOIA. The coded categories are provided to aid the Court's and Plaintiffs' review of the FBI's explanation of the FOIA exemptions it has asserted to withhold material. The coded, Bates numbered pages together with this declaration demonstrate that all material withheld by the FBI is exempt from disclosure pursuant to the cited FOIA exemptions, or is so intertwined with protected material that segregation is not possible without revealing the underlying protected material.

(62)     Each instance of information withheld on the Bates-numbered documents is

accompanied by a coded designation that corresponds to the categories listed below. For example, if (b)(7)(C)-1 appears on a document, the "(b)(7)(C)" designation refers to FOIA Exemption (7)(C) protecting against unwarranted invasions of personal privacy. The numerical designation of "1" following the "(b)(7)(C)" narrows the main category into a more specific subcategory, such as "Names and/or Identifying Information of FBI Special Agents/Support Personnel."

(63)   Listed below are the categories used to explain the FOIA exemptions asserted to withhold the protected material:

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Exemption (b)(1)** | **CLASSIFIED INFORMATION** |
| (b)(1)-1 | Intelligence Activities, Sources and Methods (E.O. 13526 §1.4(c) [cited in conjunction with (b)(3)-1] |
| **Exemption (b)(3)** | **INFORMATION PROTECTED BY STATUTE** |
| (b)(3)-1 | National Security Act of 1947 [50 USC Section 3024(i)(1)] [cited in conjunction with (b)(1)-1] |
| (b)(3)-2 | Information Specifically Exempted by 18 U.S.C. § 3123 (Pen Registers) [cited in conjunction with (b)(7)(E)-6] |
| **Exemption (b)(5)** | **PRIVILEGED INFORMATION** |
| (b)(5)-1 | Deliberative Process Privilege |
| (b)(5)-2 | Attorney Client Privilege |
| **Exemption (b)(6) and Exemption (b)(7)(C)** | **CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY AND UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| (b)(6)-1 and (b)(7)(C)-1 | Names and/or Identifying Information of FBI Special Agents and Support Personnel |
| (b)(6)-2 and (b)(7)(C)-2 | Names and/or Identifying Information of Non-FBI Federal Government Personnel |
| (b)(6)-3 and (b)(7)(C)-3 | Names and/or Identifying Information of Third Parties of Investigative Interest |

| (b)(6)-4 and (b)(7)(C)-4 | Names and/or Identifying Information of Third Parties Merely Mentioned |
|---|---|
| (b)(6)-5 and (b)(7)(C)-5 | Names and/or Identifying Information of Local Law Enforcement Personnel |
| (b)(6)-6 and (b)(7)(C)-6 | Name and/or Identifying Information regarding Third Party Victims |
| **Exemption (b)(7)(E)** | **LAW ENFORCEMENT INVESTIGATIVE TECHNIQUES AND PROCEDURES** |
| (b)(7)(E)-1 | Operational Directives |
| (b)(7)(E)-2 | Undercover Operation |
| (b)(7)(E)-3 | This code was not used in this case. |
| (b)(7)(E)-4 | Internal FBI Secure Fax Number, Email or IP Address, Intranet/Web Address |
| (b)(7)(E)-5 | Sensitive Investigative Techniques and Procedures, Including the Deployment of Computer and Internet Protocol Address Verifier ("CIPAV") |
| (b)(7)(E)-6 | Targets of Pen Registers/Trap and Trace Devices |
| (b)(7)(E)-7 | Collection and Analysis of Information |

## EXEMPTION (b)(1)
## CLASSIFIED INFORMATION

(64)     The FBI's analysis for the withholding of classified information contained in

these documents is based on the standards articulated in the FOIA statute, 5 U.S.C. § 552(b)(1).

Exemption (b)(1) protects from disclosure those records that are:

> (a)  specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy; and

> (b)  are in fact properly classified pursuant to such Executive Order.

(65)     Before I consider an Exemption (b)(1) claim for withholding agency records, I

determine whether the information in those records satisfies the requirements of Executive Order

("E.O. ")13526, the E.O. governing the classification and protection of information that affects

the national security,[19] and whether the information complies with the various substantive and

---

[19] Section 6.1 (cc) of E.O. 13526, defines "National Security" as "the national defense or foreign relations of the United States."

procedural criteria of the E.O. E.O. 13526, signed by President Barack Obama on December 29, 2009, is the E.O. that currently applies to the protection of national security information. I am bound by the requirements of E.O. 13526, when making classification determinations.

(66)    In order for information to be properly classified, and thus properly withheld from disclosure pursuant to Exemption (b)(1), the information must meet the requirements set forth in E.O. 13526 § 1.1 (a):

> (1) an original classification authority is classifying the information;
>
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
>
> (3) the information falls within one or more of the categories of information listed in § 1.4 of this order; and
>
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

(67)    As I will explain in further detail below, in my role as an original classification authority, I have determined that the information withheld pursuant to Exemption (b)(1) is under the control of the United States Government, is classified and requires a classification marking at the "Secret" level since the unauthorized disclosure of this information reasonably could be expected to cause serious damage to national security. *See* E.O. 13526 § 1.2(a)(2). In addition to these substantive requirements, certain procedural and administrative requirements of E.O. 13526 must be followed before information can be considered properly classified, such as, proper identification and marking of documents. In particular, I made certain that all procedural requirements of E.O. 13526 were followed:

> (1) each document was marked as required and stamped with the

26

proper classification designation;

(2) each document was marked to indicate clearly which portions are classified, which portions are exempt from declassification as set forth in E.O. 13526 § 1.5(b);

(3) the prohibitions and limitations on classification specified in E.O. 13526 § 1.7 were adhered to;

(4) the declassification policies set forth in E.O. 13526 §§ 3.1 and 3.3 were followed; and

(5) any reasonably segregable portions of these classified documents that did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

## FINDINGS OF DECLARANT REGARDING EXEMPTION (b)(1)

(68)     With the above requirements in mind, I personally and independently examined

the FBI information withheld pursuant to Exemption (b)(1). As a result of this examination, I

determined the classified information continues to warrant classification at the "Secret" level

pursuant to E.O. 13526 § 1.4 category (c) intelligence activities (including covert action),

intelligence sources or methods, or cryptology as the unauthorized disclosure of information that

could reasonably be expected to cause serious damage to the national security. Therefore; the

FBI is asserting FOIA Exemption (b)(1) to withhold this information.[20]

## INTELLIGENCE ACTIVITIES, SOURCES AND METHODS

(69)     E.O. 13526 § 1.4 (c) exempts intelligence activities (including covert action),

intelligence sources or methods, or cryptology. An intelligence activity or method includes any

intelligence action or technique utilized by the FBI against a targeted individual or organization

that has been determined to be of a national security interest. An intelligence method is used to

---

[20] Exemption (b)(1)-1 has been asserted on Bates Numbered pages: RCFP-2, 3, 33, 37, 41, 42, and 43.

27

indicate any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity or method has two characteristics. First, the intelligence activity or method – and information generated by it – is needed by U.S. intelligence/counterintelligence agencies to carry out their missions. Second, confidentiality must be maintained with respect to the activity or method if the viability, productivity and usefulness of its information is to be preserved.

(70)    Classification redactions may be made to protect from disclosure information that would reveal the actual intelligence activities and methods used by the FBI against specific targets of foreign counterintelligence investigations or operations; identify a target of a foreign counterintelligence investigation; or disclose the intelligence gathering capabilities of the activities or methods directed at specific targets. The criteria utilized in determining what actions by an individual or organization warrant the commencement of an investigation, or cause a certain activity to be given investigative attention over others, could be revealed through disclosure of these intelligence methods or activities. In the records at issue, the FBI protected information pertaining to specific FBI's intelligence sources and methods, including its intelligence gathering capabilities. Specifically, the sources and methods described in these records are used by the FBI in current national security investigations (i.e. intelligence or counterintelligence investigations).[21] Disclosure could reasonably be expected to cause serious damage to the national security. As a result, I have determined this information is properly classified at the "Secret" level, properly classified pursuant to E.O. 13526 § 1.4(c) and is exempt from disclosure pursuant to FOIA Exemption (b)(1). This harm justification applies to all (b)(1) material withheld under E.O. 13526 § 1.4(c).

---

[21] The specific intelligence activities, sources and methods in the records at issue are use by the FBI for dual purposes in both criminal and national security investigations.

## DEFENDANT'S BURDEN OF ESTABLISHING
## EXEMPTION (b)(1) CLAIMS

(71)    The information withheld in this case pursuant to Exemption 1 was examined in

light of the body of information available to me concerning the national defense and foreign

relations of the United States. This information was not examined in isolation. Instead, the

information was evaluated with careful consideration given to the impact that disclosure of this

information will have on other sensitive information contained elsewhere in the United States'

intelligence files, including the secrecy of that other information.  Equal consideration was given

to the impact that other information, either in the public domain or likely known or suspected by

present or potential adversaries of the United States, would have upon the information I

examined, and upon attempts by a hostile entity to analyze such information.

(72)    In those instances where, in my judgment, the disclosure of this information could

reasonably be expected to cause a serious damage to the national security, and its withholding

outweighed the benefit of disclosure, I exercised my prerogative as an original classification

authority and designated that information as classified in the interest of national security at the

"Secret" level, and invoked FOIA Exemption (b)(1) to prevent disclosure.  Likewise, the

justifications for the withheld classified information have been prepared with the intent that they

be read with consideration given to the context in which the classified information is found, but

also other information already in the public domain, as well as information likely known or

suspected by hostile intelligence entities.  It is my judgment that any greater specificity in the

description and justification set forth with respect to the intelligence activities (including special

activities) or intelligence sources or methods could reasonably be expected to jeopardize the

national security of the United States.  As a result, the classified information appearing in these

documents has been appropriately classified pursuant to E.O. 13526 and withheld pursuant to

FOIA Exemption (b)(1).

## EXEMPTION (b)(3)
## INFORMATION PROTECTED BY STATUTE

(73)    5 U.S.C. § 552(b)(3) exempts from disclosure information which is:

specifically exempted from disclosure by statute... provided that such statute (A) (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

### (b)(3)-1    NATIONAL SECURITY ACT OF 1947 [50 U.S.C. § 3024(I)(1)]

(74)    Exemption (b)(3)-1 was asserted to withhold information pursuant to Section 102A(i)(1) of the National Security Act of 1947 ("NSA"), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), 50 U.S.C. §3024(i)(1), which provides that the Director of National Intelligence ("DNI") "shall protect from unauthorized disclosure intelligence sources and methods."[22]  As relevant to U.S.C. § 552(b)(3)(B), the National Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009.[23]  On its face, this federal statute leaves no discretion to agencies about withholding from the public information about intelligence sources and methods.  Thus, the protection afforded to intelligence sources and methods by 50 U.S.C. § 3024(i)(1) is absolute.  *See* CIA v. Sims, 471 U.S. 159 (1985).

(75)    In order to fulfill its obligation of protecting intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the Intelligence Community ("IC")

---

[22] Section 1024(i)(1) of the National Security Act was previously codified at 50 U.S.C. § 403(i)(1).  As a result of the reorganization of Title 50 of the U.S. Code, Section 102A(i)(1) is now codified at 50 U.S.C. § 3024(i)(1).

[23] The OPEN FOIA Act of 2009 was enacted October 28, 2009, Pub.L. 111-83, 123 Stat. 2142, 2184; 5 U.S.C. §552(b)(3)(B).

for the classification of information under applicable laws, Executive Orders, or other Presidential Directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(i)(i)(1). The FBI is one of 17 member agencies comprising the IC, and as such must protect intelligence sources and methods.

(76)    As described above, Congress enacted the NSA, as amended by the IRTPA, to protect the IC's sources and methods of gathering intelligence. Disclosure of such information presents the potential for individuals to develop and implement countermeasures, which would result in the loss of significant intelligence information, relied upon by national policymakers and the IC. Given that Congress specifically prohibited the disclosure of information pertaining to intelligence sources and methods used by the IC as a whole, I have determined the FBI's intelligence sources and methods would be revealed if any of the withheld information is disclosed to Plaintiffs, and thus, the FBI is prohibited from disclosing the information under 50 U.S.C. § 3024(i)(1). Thus, this information was properly withheld pursuant to Exemption (b)(3)-1, as prescribed on 50 U.S.C. § 3024(i)(1), in conjunction with underlying FOIA exemptions (b)(1) and (b)(7)(E). This harm justification applies to all (b)(3)-1 material withheld under 50 U.S.C. § 3024(i)(1).[24]

### (b)(3)-2    INFORMATION SPECIFICALLY EXEMPTED BY 18 U.S.C. § 3123

(77)    Exemption (b)(3)-2 is being asserted to protect pen register information, which is specifically exempt pursuant to 18 U.S.C. § 3123(d), the Pen Register Act. The Pen Register Act protects from disclosure information pertaining to certain court "order(s) authorizing or approving the installation and use of a pen register or a trap and trace device;" and information pertaining to "the existence of the pen register or trap and trace device or the existence of the investigation." A pen register is a device that records phone numbers dialed to or from a target

---

[24] Exemption (b)(3)-1 has been asserted on Bates Numbered pages: RCFP-2, 3, 33, 37, 41-43.

telephone. The statute mandates that a court order be obtained prior to installing or using a pen register, unless the user of the telephone consents to the device. Orders for pen registers are sealed unless otherwise ordered by the court. Exemption (b)(3) protects the court order in its entirety; the identity of the individual on whom it is placed; the location of the device; information obtained from the device; and any other specifics regarding the pen register/trap and trace device. As relevant here, in the documents at issue, the FBI withheld information that if disclosed, would reveal the existence or use of a pen register or trap and trace device, or reveal the existence of an investigation involving a pen register or trap and trace device, that information is protected from disclosure by Exemption 3. As relevant to 5 U.S.C. § 552 (b)(3)(B), the Pen Register Act is a statute[25] enacted before the date of enactment of the OPEN FOIA Act of 2009.[26] Pursuant to 18 U.S.C. § 3123(d), the FBI has properly asserted FOIA Exemption (b)(3)-2 to withhold this information from disclosure, in conjunction with underlying FOIA exemption (b)(7)(E).[27]

## EXEMPTION (b)(5)
## PRIVILEGED INFORMATION

(78)    FOIA Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 has been construed to exempt documents or information normally privileged in the civil discovery context and incorporates, inter alia, the attorney work product and deliberative process privileges. Generally, the attorney work product

---

[25] The Electronic Communications Privacy Act (ECPA) was passed in 1986 (Pub. L. No. 99-508, 100 Stat. 1848). There were three main provisions or Titles to the ECPA. Title III created the Pen Register Act, which included restrictions on private and law enforcement uses of pen registers. The United States statutes governing pen registers are codified under 18 U.S.C., Chapter 206. Section 216 of the 2001 USA PATRIOT Act expanded the definition of a pen register to include devices or programs that provide an analogous function with internet communications.
[26] The OPEN FOIA Act of 2009 was enacted October 28, 2009, Pub. L. No. 111-83, 123 Stat. 2142, 2184; 5 U.S.C. § 552(b)(3)(B).
[27] Exemption (b)(3)-2 is being asserted by the FBI to withhold information on Bates Numbered pages: RCFP- 3, 33-34, 37-38, 155.

privilege protects documents and other memoranda prepared by an attorney or under the direction of an attonrey as part of, or in reasonable anticipaton of litigation. The deliberative process privilvege protects predecisional, deliberative communications that are part of a process by which agency decisions are made. It protects materials prepared as part of an agency decisionmaker's formulation of opinions, advise, evaluations, deliberations, policies, proposals, conclusions, or recommendations.

### (b)(5)-1   DELIBERATIVE PROCESS PRIVILEGE

(79)    FOIA Exemption (b)(5)-1 has been asserted to protect deliberative materials within the responsive records. The general purpose of the deliberative process privilege is to prevent injury to the quality of agency decisions. Thus, material containing or prepared in connection with the formulation of opinions, advise, evaluations, deliberations, policies, proposals, conclusions, or recommendations may properly be withheld. The privilege also protects records and information that if disclosed, would reveal the agency's collection of multitudinous facts, and the sorting, evaluation, and analysis of those facts in order to make recommendations or reach a final agency decision. The agency's treatment of such information is itself, a deliberation and is a deliberative process properly protected by the privilege. Disclosure of this type of information would have an inhibiting effect upon agency decision-making and the development of policy because it would chill full and frank discussions between agency personnel and decision makers regarding a decision. If agency personnel know that their preliminary impressions, opinions, evaluations, or comments would be released to the general public, they would be less candid and more circumspect in expressing their thoughts, which would impede the fulsome discussion of issues necessary to reach a well-reasoned decision.

(80)    Exemption 5 is predicated on the recognition that release of this privileged information would inhibit the government's development of policy and stifle its decision-making

process. Furthermore, exempting such documents from disclosure also protects against public confusion that might result from preliminary disclosure of opinions and information that do not, in fact, reflect the final views or policies of the FBI. The FBI invokes Exemption 5 and the deliberative process privilege because FBI employees would hesitate to offer their candid and conscientious opinions to superiors or coworkers if they knew their opinions of the moment might be made a matter of public record at some future date, and because such self-censorship would, in turn, degrade the quality of agency decisions by depriving the decision-makers of fully-explored options developed from robust debate. The FBI also relies on Exemption 5 in conjunction with the deliberative process privilege to ensure that FBI employees are not forced to operate in a fishbowl when collecting and analyzing information leading to final agency decisions.

(81)     In order to apply Exemption 5, agencies must first satisfy the threshold requirement – *i.e.*, show that the information protected was "inter-agency or intra-agency." Once the threshold is satisfied, agencies must satisfy the elements of the pertinent privilege. With respect to the deliberative process privilege, agencies must show that the withheld information was both predecisional – *i.e.*, antecedent to a final agency decision – and deliberative – *i.e.*, part of a process by which the agency endeavored to reach a final decision (whether or not any final decision was ever reached).

(82)     The FBI relied on the deliberative process privilege, in conjunction with Exemption 5, to protect information in the responsive records reflecting the decision-making process of the FBI, alone or in conjunction with other DOJ components, regarding the scope and focus of the investigation, as well as any related prosecutions. Specifically, the FBI withheld information in emails between FBI's attorneys and other FBI personnel discussing matters

34

pertaining to the application of an investigative technique, and a report containing information

discussing legal issues regarding the Timberline School Investigation. The materials are

predecisional in that they precede final investigative and/or prosecutive decisions, and

deliberative in that they played a part in the process by which specific decisions were made about

the scope and focus of the investigation and prospective prosecution at issue. Accordingly, the

FBI has properly withheld this privileged information pursuant to FOIA Exemption (b)(5)-1.[28]

### (b)(5)-2   ATTORNEY CLIENT PRIVILEGE

(83)    Exemption (b)(5)-2 has been asserted to protect confidential communications

between  clients seeking legal advice from a professional legal adviser in his/her capacity as a

lawyer. Such communications are permanently protected from disclosure by the legal adviser

unless the client waives the protection. This privilege encompasses confidential communications

made to the attorney by decision-making personnel as well as lower echelon employees who

possess information relevant to an attorney's advice-rendering function. Disclosure of the

communications between FBI attorneys and their clients would impede the full disclosure of all

of the information that relates to the client's reasons for seeking legal advice, which is necessary

if the professional mission is to be accomplished.

(84)    The FBI has protected communications between and among FBI counsel and their

FBI client employees reflecting the seeking and/or providing of legal advice with respect to

aspects of the investigation and related prosecution at issue. Specifically, the FBI withheld

information from emails between FBI's attorneys and other FBI personnel discussing matters

pertaining to the application of an investigative technique, and a report containing information

discussing legal issues regarding the Timberline School Investigation. These communications

---

[28] Exemption (b)(5)-1 has been asserted on Bates Numbered pages: RCFP- 25, 26, 27, 30, 51, and 52.

were made in confidence and for the purpose of formulating and dispensing legal advice; disclosure of these two-way communications between the FBI attorneys and their agency clients would inhibit clients from being completely candid with their attorneys in relation to the issues about which they are seeking legal advice. Such candor and full disclosure is necessary in order to ensure that thorough and sound legal advice is provided. Accordingly, the FBI has properly withheld this privileged information pursuant to FOIA Exemption (b)(5)-2.[29].

## EXEMPTION (b)(7) THRESHOLD

(85)   Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Pursuant to 28 U.S.C. §§ 533, 534, and Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM") and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States. Under this investigative authority, portions of the responsive records were compiled for purposes of investigating and gathering intelligence information, and apprehending and prosecuting subjects suspected of terrorism against the United States; these records relate to enforcement of pertinent federal laws and within the core law enforcement duty of the FBI. Other portions of the responsive records were compiled during the FBI's criminal investigation of a third-party subject for violations of 18 U.S.C. § 875(c), Interstate Transmission of Communication Containing Treat to Injure, and 1030(a)(5)(A)(i) and

---

[29] Exemption (b)(5)-2 has been asserted on Bates Numbered pages: RCFP 25,26, 27, 30, and 52.

(B)(iv), Computer Intrusion Causing a Threat to Public Safety.  This description applies to all of the records the FBI withheld pursuant to the various coded categories of FOIA exemptions (b)(7)(C) and (b)(7)(E).  The FBI is responsible for detecting and investigating violations of Federal criminal laws, international terrorism, and threats to national security.  Thus, these records were compiled for a law enforcement purpose; they fall within the law enforcement duties of the FBI.  Therefore, the information meets the threshold requirement of Exemption (b)(7).

## EXEMPTIONS (b)(6) AND (b)(7)(C)
## CLEARLY UNWARRANTED AND UNWARRANTED
## INVASION OF PERSONAL PRIVACY

5 U.S.C. § 552 (b)(6) exempts from disclosure:

personnel and medical files and similar files when the disclosure of
such information would constitute a clearly unwarranted invasion
of personal privacy.

5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

records or information compiled for law enforcement purposes, but only to the
extent that the production of such law enforcement records or information . . .
could reasonably be expected to constitute an unwarranted invasion of personal
privacy.[30]

(86)    When withholding information pursuant to these exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure.  In asserting these exemptions, each item of information was examined to determine the nature and strength of the privacy interest of every individual whose name and/or

---

[30] The practice of the FBI is to assert Exemption (b)(6) in conjunction with (b)(7)(C).  Although the balancing test for (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" standard, and the test for (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion.  The privacy interests are balanced against the public's interest in disclosure under the analysis of both exemptions.

identifying information appears in the documents at issue. For the purposes of these exemptions, the only recognized public interest is that which sheds light on the operations and activities of the federal government. In making this analysis, the public interest in disclosure of this information was determined by assessing whether the information in question would shed light on the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats and to uphold and enforce the criminal laws of the United States. In each instance where information was withheld, it was determined that individual privacy rights outweighed the public interest. The FBI concluded that the information should be withheld under Exemptions (b)(6) and (b)(7)(C) and determined that the individuals' privacy interests were not outweighed by any public interest in disclosure. Every effort has been made to release all segregable information contained in these records without invading the privacy interests of these individuals. There are three withholding subcategories as described in detail below.

### (b)(6)-1 and (b)(7)(C)-1     NAMES AND/OR IDENTIFYING INFORMATION OF FBI SPECIAL AGENTS AND SUPPORT PERSONNEL

(87) In Category (b)(6)-1 and (b)(7)(C)-1, the FBI protected the names of FBI Special Agents ("SAs") and support personnel who were responsible for conducting, supervising, and/or maintaining the investigative activities, as well as, the day-to-day operations of the FBI reported in the documents. These responsibilities may include, but are not limited to, conducting interviews, coordinating with other law enforcement officials, and compiling the resulting information, as well as, reporting on the status of the investigation. Assignments of SAs and support personnel to any particular investigation are not by choice. Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting and assisting in other investigations. The privacy consideration is also to protect FBI SAs and support personnel, as individuals, from unnecessary,

unofficial questioning as to the conduct of the investigation or other investigations, whether or not they are currently employed by the FBI.

(88)    FBI SAs conduct official inquiries into various criminal violation and national security cases. They come into contact with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. It is possible for an individual targeted by such law enforcement actions to carry a grudge which may last for years. These individuals may seek revenge on the agents and other federal employees involved in a particular investigation. The publicity associated with the release of an agent's identity in connection with a particular investigation could trigger hostility toward a particular agent. The support employees were, and possibly are, in positions of access to information regarding official law enforcement investigations, and therefore could also become targets of harassing inquiries for unauthorized access to investigations if their identities were released. As a result, they maintain a substantial privacy interest in not having their identities disclosed. In contrast, there is no public interest to be served by disclosing the identities of the SAs and support personnel to the public because their identities would not significantly increase the public's understanding of the FBI's operations and activities. Thus, disclosure of this information would constitute a clearly unwarranted and an unwarranted invasion of these employees' personal privacy. The FBI has properly protected this information pursuant to FOIA Exemptions (b)(6)-1 and (b)(7)(C)-1.[31]

## (b)(6)-2 and (b)(7)(C)-2        NAMES AND/OR IDENTIFYING INFORMATION OF NON-FBI FEDERAL GOVERNMENT PERSONNEL

(89)    In Category (b)(6)-2 and (b)(7)(C)-2, the FBI protected the names and identifying

---

[31] Exemption (b)(6)-1 and (b)(7)(C)-1 has been asserted on Bates Numbered pages: RCFP 1-4, 10, 16, 25-27, 30, 33-35, 37-41, 44-45, 55, 57-59, 62-65, 74-75, 77-78, 101-153, 155, and 157. Upon further review of the records the FBI also asserts (b)(6)-1 and (b)(7)(C)-1 to withhold information on Bates Numbered pages: RCFP 161-174.

information of non-FBI federal government personnel in records responsive to Plaintiffs'

requests. The relevant inquiry involves whether public access to this information would violate a

viable privacy interest of these individuals, and whether a public interest supports releasing their

identities. Disclosure of their identities and identifying information could subject these DOJ

Attorneys and support personnel to unauthorized inquiries and harassment and would constitute a

clearly unwarranted invasion of their personal privacy. The rationale for protecting non-FBI

federal employees is the same as that for FBI employees discussed at ¶¶ 87-88, *supra*. In

balancing the legitimate privacy interest of these individuals against any public interest in

disclosure, the FBI determined that there is no bona fide public interest in this information

because its disclosure will not shed light on the operations and activities of the federal

government. Accordingly, the FBI concluded the disclosure of this information would

"constitute a clearly unwarranted" and "unwarranted invasion of their personal privacy." The

FBI properly protected the names and identifying information of non-FBI federal government

personnel pursuant to FOIA Exemptions (b)(6)-2 and (b)(7)(C)-2.[32]

### (b)(6)-3 and (b)(7)(C)-3      NAMES AND/OR IDENTIFYING INFORMATION OF<br>THIRD PARTIES OF INVESTIGATIVE INTEREST

(90)     In Category (b)(6)-3 and (b)(7)(C)-3, the FBI protected the names and/or

identifying information of third-parties who were of investigative interest to the FBI or other law

enforcement agencies. Identifying information may include, but is not limited to, names, dates

of birth, social security numbers, addresses, telephone numbers, and/or other personal

information. Identification as a subject of a criminal investigation such as the individuals

identified in the responsive material pertaining to the investigation of the bomb threats and

distributed denial of service ("DDOS") attacks received at Timberline School District, carries a

---

[32] Exemption (b)(6)-2 and (b)(7)(C)-2 has been asserted on Bates Numbered pages: RCFP 25, 26, 30 and 35.

strong negative connotation and a stigma. Release of the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. Accordingly, the FBI has determined that these individuals maintain substantial privacy interests in not having their identities disclosed. In contrast, disclosing personal information about these individuals would not significantly increase the public's understanding of the FBI's or other law enforcement agencies' performance of their mission and so the FBI concluded that there was no public interest here sufficient to override these individuals' substantial privacy interests. For these reasons, the FBI properly withheld this information pursuant to FOIA Exemptions (b)(6)-3 and (b)(7)(C)-3.[33]

### (b)(6)-4 and (b)(7)(C)-4   NAMES AND/OR IDENTIFYING INFORMATION OF THIRD PARTIES MERELY MENTIONED

(91)    In Category (b)(6)-4 and (b)(7)(C)-4, the FBI protected the names and identifying information of third parties merely mentioned in the records at issue. Identifying information may include, but is not limited to, names, familial relationships, telephone/facsimile numbers, mailing addresses, Email addresses, IP addresses and other personal information. The FBI obtained information concerning third parties who came into contact with the subjects of the investigations. These individuals were not of investigative interest to the FBI. These third parties maintain legitimate privacy interests in not having their identifying information disclosed. If the FBI disclosed their names and other personal information, the disclosure would reveal that these third parties were connected with the FBI's investigations in some way. Disclosure of these third parties' names and identifying information in connection with the FBI's investigation of criminal activities carries an extremely negative connotation. Disclosure of their identities would subject these individuals to possible harassment or criticism and focus derogatory

---

[33] Exemption (b)(6)-3 and (b)(7)(C)-3 has been asserted on Bates Numbered pages: RCFP 2, 44, 46, 48-50, 57, 78-79, and 156-159.

inferences and suspicion on them.  Accordingly, the FBI determined that these third parties

maintain a substantial privacy interest in not having information about them disclosed.  After

identifying the substantial privacy interests these individuals maintain, the FBI balanced their

right to privacy against the public interest in the disclosure.  The FBI has determined that the

personal privacy interests in non-disclosure outweighed the public in disclosure, as disclosure

would not shed any light on the operations and activities of the FBI.    Thus, disclosure of this

information would constitute a clearly unwarranted and unwarranted invasion of their personal

privacy.  Accordingly, the FBI redacted this information pursuant to FOIA Exemptions (b)(6)-4

and (b)(7)(C)-4.[34]

### (b)(6)-5 and (b)(7)(C)-5   NAMES AND/OR IDENTIFYING INFORMATION OF LOCAL LAW ENFORCEMENT PERSONNEL

(92)    In Category (b)(6)-5 and (b)(7)(C)-5, the FBI withheld the names and identifying

information of local law enforcement personnel.  These employees were acting in their official

capacity and aided the FBI in the law enforcement investigative records responsive to Plaintiffs'

requests.  The rationale for protecting the identities of FBI SAs and support personnel discussed

at ¶¶ 87-88, *supra*, also supports withholding the names and identifying information of these

local law enforcement personnel.  To release the identities of these law enforcement personnel

could subject them as individuals to unnecessary, unwarranted harassment which would

constitute an unwarranted invasion of privacy.  Furthermore, these individuals could become a

prime target for compromise if their identities were known.  There is no public interest to be

served in releasing the identities of these individuals.  The FBI concluded that the disclosure of

this information would constitute a clearly unwarranted and an unwarranted invasion of their

personal privacy.  The FBI has properly withheld this information pursuant to FOIA Exemptions

---

[34] Exemption (b)(6)-4 and (b)(7)(C)-4 has been asserted on Bates Numbered pages: RCFP 62, 74, 101-104, 106-113, 116, 118-122, 124-128, 134-149, 151-153, and 155-159.

(b)(6)-5 and (b)(7)(C)-5.[35]

### (b)(6)-6 and (b)(7)(C)-6    NAMES AND/OR IDENTIFYING INFORMATION
### REGARDING THIRD PARTY VICTIMS

(93)    In Category (b)(6)-6 and (b)(7)(C)-6, the FBI protected the names, email

addressses and other identifying information of victims of a crime.  To release a victim's identity

could cause harm to the victim, such as personal distress or embarrassment.  Thus, there is a

strong privacy interest in the protection of such personal information.  The FBI could identify no

discernible public interest in the disclosure of this information because the disclosure of the

victim's name and identifying information would not shed light on the operations and activities

of the FBI.  Thus, disclosure of this information would constitute a clearly unwarranted invasion

of personal privacy and could reasonably be expected to constitute an unwarranted invasion of

personal privacy.  Accordingly, the FBI properly protected these individuals' privacy interests

pursuant to FOIA Exemptions (b)(6)-6 and (b)(7)(C)-6.[36]

### EXEMPTION (b)(7)(E)
### INVESTIGATIVE TECHNIQUES AND PROCEDURES

5 U.S.C. § 552(b)(7)(E) provides protection for:

> Law enforcement records which would disclose techniques and procedures for
> law enforcement investigations or prosecutions, or would disclose guidelines for
> law enforcement investigations or prosecutions if such disclosure could
> reasonably be expected to risk circumvention of the law.

(94)    Exemption (b)(7)(E) has been asserted to protect information containing sensitive

investigatory techniques and procedures authorized for use by the FBI.  This exemption affords

categorical protection to techniques and procedures used in law enforcement investigations; it

protects techniques and procedures not well-known to the public as well as non-public details

---

[35] Exemption (b)(6)-5 and (b)(7)(C)-5 has been asserted on Bates Numbered pages: RCFP 2, 34, 38-40, 75-76, 103, 107, 117, 121, 125, 140, 151-152, 155, and 159.

[36] Exemption (b)(6)-6 and (b)(7)(C)-6 has been asserted on Bates Numbered pages: RCFP 1-2, 55, 58-59, 102-104, 106-108, 110-113, 120-122, 124-126, 128, 140-149, 152-153, and 157.

about the use of well-known techniques and procedures. While several documents could easily

be characterized as consisting fully of information that would disclose investigative techniques

and procedures, and thus would be eligible for protection under (b)(7)(E) in their entirety, the

FBI endeavored to release as much segregable information as possible to Plaintiffs. The release

of additional information would disclose techniques and/or procedures used in law enforcement,

criminal and national security investigations or prosecutions, or would disclose guidelines for

law enforcement, criminal and national security investigations or prosecutions that could

reasonably be expected to risk circumvention of the law.

(95)    The FBI's rationale for protecting this information cannot be examined in a

vacuum; it must be analyzed within the larger context of our country's current national security

climate. The FBI is charged with protecting the nation from security risks posed by U.S. and

non-U.S. individuals, organizations (such as terrorist groups), and foreign nations that seek to

harm the United States. Thus, if specific investigative techniques or procedures are made public,

the very criminals and terrorist groups who seek harm to U.S. interests can use the information to

their advantage, learn FBI tactics in gathering information, and develop countermeasures to

avoid detection.

### (b)(7)(E)-1   OPERATIONAL DIRECTIVES

(96)    In Category (b)(7)(E)-1, the FBI protected certain information contained in the

FBI's Domestic Investigations and Operations Guide, Field Guides, its Manual of Administrative

Operations and Procedures and its Manual of Investigative Operations Guidelines responsive to

Plaintiffs' requests. This law enforcement material comprises operational directives that provide

information and instruct FBI employees on the proper use of certain sensitive non-public FBI

procedures, techniques, and guidance for conducting investigations. In the course of providing

these instructions, these guides identify the procedures, techniques, and strategies at issue.

Specifically, the protected information falls within both subtypes of 7(E): law enforcement techniques and procedures and law enforcement guidelines. Releasing such information would not only provide sensitive, unknown investigative techniques, it would also reveal sensitive unknown uses of these specific techniques and procedures. If released, the information would provide individuals and entities with a unique look inside the FBI's law enforcement and national security "playbooks." Armed with such information, criminals could predict how and when the FBI will respond to certain suspicious/criminal activities, and the investigative techniques the FBI is most likely to employ in those situations. This would afford criminals the ability to preemptively modify their behavior in a manner that avoids detection and disrupt the very investigative procedures, techniques, and strategies that these FBI guides are intended to protect. Consequently, the release of this information would increase the risk that targets of both criminal and national security investigations could develop countermeasures and avoid detection by interfering with the FBI's ability to effectively use these important law enforcement techniques. Release of this information would allow individuals and entities seeking to commit crimes or threaten U.S. national security an opportunity to avoid detection and circumvent the law. Thus, the FBI properly withheld this information pursuant to FOIA Exemption (b)(7)(E)-1.[37]

### (b)(7)(E)-2   UNDERCOVER OPERATION

(97)    In Category (b)(7)(E)-2, the FBI protected non-public details about an undercover operation conducted by the FBI and described in the records responsive to Plaintiffs' requests. If the FBI were to disclose these non-public details about how it conducts undercover operations and release details of the specific techniques used during this undercover operation, it could have

---

[37] Exemption (b)(7)(E)-1 has been asserted on Bates Numbered pages: RCFP 52, 178, 179, 181, 186, 192, 194-196, 199, 204-205, 208, 210-211, 213, 218, 247-248, 250, 253-255, and 257-267

devastating operational consequences and would jeopardize future use of undercover operations by the FBI in similar cases or under similar circumstances; thus, disclosure of these details would risk circumvention of the law.  The FBI properly protected information about this undercover operation pursuant to Exemption (b)(7)(E)-2.[38]

### (b)(7)(E)-4   INTERNAL FBI SECURE FAX NUMBER, PHONE NUMBERS

(98)    In Category (b)(7)(E)-4, the FBI protected internal secure fax numbers and phone numbers.  Release of this type of information could allow individuals under investigation to exploit the FBI's Information Technology system, by allowing the opportunity to misuse these venues.  Criminals could interfere with the FBI's ability to timely and accurately conduct investigations, by exploiting this unclassified but non-public information, and by inundating these venues with phone calls and faxes providing inaccurate and misleading information.  Such actions could arm them with the information or ability to circumvent the law.  Additionally, release of this information would allow individuals to disrupt official business and could subject FBI employees to harassing phone calls and facsimiles.  Thus, the FBI properly protected this information from disclosure pursuant to FOIA Exemption (b)(7)(E)-4.[39]

### (b)(7)(E)-5   SENSITIVE INVESTIGATIVE TECHNIQUES AND PROCEDURES, INCLUDING THE DEPLOYMENT OF COMPUTER AND INTERNET PROTOCOL ADDRESS VERIFIER ("CIPAV")

(99)    In Category (b)(7)(E)-5, the FBI protected the non-public details concerning the deployment of CIPAV, as well as other techniques and procedures utilized by the FBI in both criminal and national security investigations, including information revealing what types of techniques and procedures are routinely used in such investigations and are not publicly known,

---

[38] Exemption (b)(7)(E)-2 has been asserted on Bates Numbered pages: RCFP 3, 44-45, 49, 52-53, 55-61, 62-63, 65-75, 114-115, 129-132 and 139-153.

[39] Exemption (b)(7)(E)-4 is being asserted to withhold portions of information contained on Bates Numbered pages: RCFP 26 and 30.

as well as non-public details about the use of well-known techniques and procedures. The

government's use of CIPAV in the Timberline High School investigation is a known public fact;

however, the specific details concerning the deployment of CIPAV are not well-known. All

documents at issue contain sensitive information about the deployment of CIPAV and other

specific investigative methods and techniques used by the FBI in furtherance of both criminal

and national security investigations.

(100)   To describe the investigative methods and techniques in further detail would

highlight the very information the FBI seeks to protect pursuant to this exemption. Revealing

details about information-gathering methods and techniques commonly used in both criminal and

national security investigations, and the circumstances under which they are used, would enable

the targets of those methods and techniques to avoid detection of and develop countermeasures

to circumvent the FBI's ability to effectively use such critical law enforcement methods and

techniques in current and future criminal and national security investigations, thus risking the

circumvention of the law. Accordingly, the FBI properly withheld this information pursuant to

FOIA Exemption (b)(7)(E)-5.[40]

### (b)(7)(E)-6   TARGETS OF PEN REGISTERS/TRAP AND TRACE DEVICES[41]

(101)   In Category (b)(7)(E)-6, the FBI protected the non-public details about targets of

FBI pen registers/trap and trace devices. Releasing the non-public details about these targets

within the context of these documents would reveal when and why the FBI decides to utilize a

pen register/trap and trace device. Revealing these non-public details about the FBI's use of

these devices would provide criminals with an understanding of when they should expect the FBI

to deploy this investigative technique and make it easier for them to develop countermeasures to

---

[40] Exemption (b)(7)(E)-5 has been asserted on Bates Numbered pages: RCFP 3, 4, 10, 25, 26, 30, 34, 38-49, 53, 54, 74, 116, and 137-138
[41] Exemption (b)(7)(E)-6 has been asserted on Bates Numbered pages: RCFP 3, 33, 34, 37, 38, 155.

avoid disruption and detection by the FBI.  In this manner, release of this information would

deprive the FBI of the utility of this essential investigative technique and enable criminals to

circumvent the law.  Therefore, the FBI protected this information pursuant to Exemption

(b)(7)(E)-6.  This is the same information the FBI is protecting pursuant to Exemption (b)(3) as

mandated by 18 U.S.C. § 3123 (Pen Registers).

### (b)(7)(E)-7   COLLECTION AND ANALYSIS OF INFORMATION

(102)   Exemption (b)(7)(E)-7 has been asserted to protect the techniques and procedures

the FBI uses to collect and analyze information in connection with both criminal and national

security investigations.  The release of this information would disclose the identity of methods

used in collecting and analyzing information, including how and from where the FBI collects

information, and the methodologies employed to analyze it.  Such disclosures would enable

investigative subjects to circumvent similar and currently used techniques.  The relative utility of

these techniques could be diminished if the actual techniques were released.  In turn, this would

facilitate the accumulation of information by investigative subjects regarding the circumstances

under which specific techniques were used or requested to collect certain information, how the

information collected is analyzed, and the usefulness of the information obtained.  Release of this

information would enable criminals and terrorists to educate themselves on techniques employed

by the FBI in collecting and analyzing information, thus allowing them to take countermeasures

to circumvent the effectiveness of these techniques.

(103)   Similar to the reasoning articulated above, the FBI's use of CIPAV during the

FBI's investigation of the Timberline High School investigation is a known public fact; however,

the specific details collected by this tool, as well as the other methods the FBI utilizes to collect,

and analyze the information are not publically known.  Several of these documents contain

sensitive information about investigative methods used by the FBI in conducting both criminal

48

and national security investigations.  The methods are detailed within the documents in varying

degrees of specificity.  Releasing information on these methods and use would, in essence,

highlight the types of activities, facts, or occurrences that are of particular interest to the FBI in

both criminal and national security investigations.  Publicly disclosing investigative methods,

analysis of information gleaned from the methods, or any other sort of details regarding it, would

inform individuals of the kinds of information the FBI is interested in capturing and would afford

them the opportunity to employ countermeasures to circumvent detection or alter behavior to

mislead investigators.  Accordingly, the FBI properly withheld this information pursuant to

FOIA Exemption (b)(7)(E)-7.[42]

## SEGREGABILITY

(104)   Plaintiffs were provided all responsive non-exempt records or portions of records

responsive to their FOIA requests to the FBI.  During the processing of Plaintiffs' requests, each

responsive page was individually examined.  A line by line review was conducted to identify

non-exempt information that could be reasonably segregated from exempt information for

release.  All segregable information has been released to Plaintiffs.  As demonstrated herein, the

only information withheld by the FBI consists of information that would trigger reasonably

foreseeable harm to one or more interests protected by the cited FOIA exemptions.

(105)   As discussed in ¶ 4 *supra*, there were 267 responsive pages identified:  103 pages

were Released in Part ("RIP"), and 81 pages were Withheld in Full ("WIF").  Each of these

categories is discussed below to further address segregability.

  (a) Pages RIP.  Following the segregability review, RIDS determined that 103

  pages could be released in part with redactions per the identified FOIA

---

[42] Exemption (b)(7)(E)-7 has been asserted on Bates Numbered pages: RCFP 103-105,  and 155-174.  Upon further review of the records the FBI also asserts (b)(7)(E)-7 to withhold information on Bates Numbered page: RCFP 2.

exemptions herein. These pages comprise a mixture of material that could be segregated for release and material that was withheld as release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions on these pages.

(b)     Pages WIF. Following the segregability review, RIDS determined that 81 pages were required to be withheld in their entirety. RIDS determined that 22 of these pages were duplicate of other pages processed and all information in the remaining 59 pages was covered by one or more of the cited FOIA exemptions; therefore, there was no information that could be reasonably segregated for release without triggering foreseeable harm to one or more of the cited FOIA exemptions.

## CONCLUSION

(106)   The FBI conducted a reasonable search for records responsive to Plaintiffs' requests and subject to the FOIA. The FBI has processed and released all reasonably segregable information from the responsive records. Information has been properly withheld pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(C) and (b)(7)(E), 5 U.S.C. §§ 552 (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E). The FBI has carefully examined the responsive records and has determined that the information withheld from plaintiffs, if disclosed, could reasonably be expected to reveal information that would cause serious damage to national security, would violate federal statutes governing release of information on national security operations, would reveal privileged information, would cause a clearly unwarranted invasion of personal privacy and could reasonably be expected to constitute an unwarranted invasion of personal privacy, and/or would disclose techniques and procedures for law enforcement investigations or prosecutions, the disclosure of which, could reasonably be expected to risk

circumvention of the law.  The FBI has determined that there is no further reasonably segregable information subject to the FOIA to be released.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct, and that Exhibits A-Z attached hereto are true and correct copies.

Executed this _____ day of March, 2016.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia