IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, and THE ASSOCIATED PRESS, Plaintiffs, v. FEDERAL BUREAU OF INVESTIGATION, and UNITED STATES DEPARTMENT OF JUSTICE Defendants. | Civil Action No. 15-cv-1392 (RJL) |

**DEFENDANTS' COMBINED REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT, IN OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND/OR PARTIAL SUMMARY JUDGMENT, AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR *IN CAMERA* REVIEW
AND/OR OTHER APPROPRIATE RELIEF**

**INTRODUCTION**

Summary judgment in favor of Defendants is proper.  In response to the three Freedom of

Information Act ("FOIA") Requests at issue in this case, the Federal Bureau of Investigation

("FBI") conducted a multi-pronged search that included eight separate agency components

deemed reasonably likely to have records responsive to the various parts of Plaintiffs' three

FOIA Requests; the FBI then conducted separate subsequent searches of its Central Records

System ("CRS") and Electronic Surveillance ("ELSUR") indices for documents related to the

Timberline High School case.  And as discussed further below, in response to Plaintiffs' April 25th filings the FBI has more recently conducted a broader search of the CRS for other possible incidents; that search resulted in no responsive records.   The FBI made reasonable efforts to respond to Plaintiffs' FOIA requests, *see* 5 U.S.C. § 552(a)(3)(C), and thus has satisfied its search obligations.   Plaintiffs' contrary arguments in their memorandum in opposition to Defendants' motion for summary judgment and in support of Plaintiffs' motion for summary judgment and/or partial summary judgment, *see* ECF No. 19 ("Opp.")—based on a combination of mischaracterizations of the FBI's search efforts and bare speculation about the possible existence of other responsive documents—are without merit.

Defendants have also shown that their assertion of FOIA Exemptions 1, 3, 5, 6, 7(C), and 7(E) are fully supported.  Plaintiffs have nonetheless taken a kitchen sink approach to this litigation, challenging essentially all of the FBI's withholdings, notwithstanding both the detail supplied by the Hardy Declaration and the deference owed to the FBI's judgment in cases that implicate matters of national security.

With regard to information withheld under Exemption 1, the Hardy Declaration amply satisfies the Government's minimal burden to show that the small amount of classified material at issue—which contains information pertaining to intelligence sources and methods—was properly classified, and Plaintiffs' various allegations of procedural deficiencies lack merit.  In any event, Mr. Hardy's Second Declaration that accompanies this brief ("Second Decl." or "Second Declaration") provides further information concerning the classified material, and additional confirmation that this material was properly withheld under Exemption 1.  This further information likewise makes clear that, even if this Court were to accept Plaintiffs' invitation to second-guess the FBI's classification decisions (which, respectfully, it should not), the same

material was also properly withheld under Exemption 3 pursuant to the National Security Act of 1947.

The FBI also properly withheld a limited set of materials under Exemption 5 pursuant to the attorney-client privilege and deliberative process privilege.  These withholdings—within emails between FBI attorneys and other FBI personnel discussing an application for a search warrant and accompanying affidavit, and in a report containing analysis of legal issues related to the Timberline School Investigation—were entirely appropriate and Plaintiffs' challenges to them are without merit.  The FBI likewise correctly invoked Exemptions 6 and 7(C) to redact the names and identifying information of FBI Special Agents and support staff, and various other federal employees and local law enforcement personnel.  Numerous courts have accepted similar withholdings and Plaintiffs do not offer any meaningful argument as to why disclosing this identifying information would in any sense inform the citizenry of what their Government is up to.  And the FBI properly invoked Exemption 7(E) to protect sensitive investigatory techniques, procedures, and guidelines authorized for use by the FBI to pursue its law enforcement missions.  Finally, by representing that a line by line review was conducted to identify non-exempt information and breaking down the exempted material into detailed categories, the FBI satisfied its obligation to demonstrate that it released all reasonably segregable non-exempt information.  Summary judgment is warranted.

Plaintiffs also propose in a separate motion that this Court conduct an *in camera* review of 77 pages withheld in full or in part.  This Court should reject that request as well.  As the D.C. Circuit has repeatedly made clear, *in camera* review should not be utilized when an agency meets its summary judgment burden through declarations and, in national security cases like this one, should only be employed as a last resort.  Because the FBI has demonstrated that it has fully

complied with its obligations under FOIA, *in camera* review is neither necessary nor appropriate.

Accordingly, the Court should grant Defendants' motion for summary judgment and deny both Plaintiffs' motion for *in camera review* and/or other appropriate relief and Plaintiffs' motion for summary judgment and/or partial summary judgment.

## ARGUMENT

### I.     The FBI Conducted an Adequate Search for Responsive Records

The three FOIA Requests at issue in this case collectively sought the following information (truncated in parts for brevity):

a. "Any documents referring to the decision to create the fake AP news article in the Timberline High School case. . . .";

b. "An accounting of the number of times, between Jan. 1, 2000 and Nov. 6 2014, that the [FBI] has impersonated media organizations or generated media-style material (including but not limited to emails, webpages or links) to deliver malicious software to suspects or anyone else caught up in an investigation";

c. "Any documents—including training material, reviews and policy briefings—dealing with the creation and deployment of bogus news stories or media-style material in an investigative context";

d. "[A]ll records concerning the FBI's guidelines and policies concerning undercover operations or activities in which a person may act as a member of the news media . . ."; and

e. "[A]ll records concerning the FBI's utilization of links to what are, or appear to be, news media articles or news media websites to install data extraction software, remote access search and surveillance tools, or the 'Computer and Internet Protocol Address Verifier' (CIPAV)."

Hardy Decl. ¶¶ 5-6, 16-17 & Exs. A, K-L.

As previously explained, the FBI drew a distinction between the demand for "access to and copies of all records concerning the FBI's utilization of links to what are, or appear to be, news media articles or news media websites to install data extraction software, remote access search and surveillance tools, or the 'Computer and Internet Protocol Address Verifier'" ("Group

4

1 requests"), and the remaining items ("Group 2 requests").   Hardy Decl. ¶ 34.   The FBI concluded—for reasons discussed further below—that any material responsive to the Group 1 requests would logically be found in its Operational Technology Division ("OTD").   *Id.* ¶¶ 37-40 & n.6.   It accordingly requested that OTD conduct a search of its database systems (as well as paper and manual files) for records responsive to the Group 1 requests, and recommended that OTD email each of its employees to ask them to search for responsive records as well.   *Id.* ¶¶ 38, 40.

As to the Group 2 requests, the FBI concluded that these requests sought a mix of records not necessarily linked to a particular investigative subject—records pertaining to, inter alia, guidelines, policies, training material, and reviews—as well as documents merely referring to the decision to create a fake AP news article in the Timberline High School case; it then identified eight[1] different components reasonably likely to possess responsive records and likewise requested that those components search their database systems and paper and manual files, while also recommending that each component email their employees to ask them to search for responsive records.   Hardy Decl. ¶ 43.   The FBI advised each component that "it was relying on their expertise to help identify responsive records, regardless of whether they may be located in their office or elsewhere else in the Bureau," and further "requested those Divisions/Units to provide records, even if they believe they may be available in the FBI internal website, another office, unit, section, division, or field office may also provide the same document, or if they posses document that satisfy an inquiry that was not specifically directed to it."   Second Decl. ¶ 6.   With respect to the second category of information set forth above, the FBI contacted OTD (which, as noted below, is the component responsible for the deployment and collection of such

---

[1] The Hardy Declaration identified seven components but inadvertently omitted the Inspection Division, which also was included in the request.   Second Decl. ¶ 6 n.5.

electronic surveillance) and OTD advised that it does not maintain "[a]n accounting" of the sort sought by Plaintiffs.  *See id.* ¶ 8.  To the extent Plaintiffs seek to require the FBI to ***create*** such an accounting, FOIA imposes no such obligation.  *See, e.g.*, *Yeager v. Drug Enforcement Admin.*, 678 F.2d 315, 321 (D.C. Cir. 1982) ("It is well settled that an agency is not required by FOIA to create a document that does not exist in order to satisfy a request.").  The FBI subsequently supplemented its prior efforts by searching its CRS and ELSUR indices using the search terms "Timberline," "Timberline High School" and "Timberline Highschool," with neither search leading to any records that had not been found during the previous search efforts. Hardy Decl. ¶¶ 57-59.

The FBI's search was reasonably calculated to locate records responsive to Plaintiffs' FOIA Requests.  Although Plaintiffs launch a variety of criticisms at the FBI's efforts, none is persuasive.

Initially, Plaintiffs contend that the FBI acted unreasonably in limiting its Group 1 search to OTD.  Opp. at 17-18.  But as Mr. Hardy's Second Declaration explains, "FBI's policy specifically states that OTD is solely responsible for the deployment and collection of all lawfully conducted electronic surveillance bureau wide, such as the alleged methods, techniques, and procedures at issue in this request."  Second Decl. ¶ 4 (footnote omitted).  "Even if individual field offices coordinate with OTD to install or deploy these capabilities, any deployment of CIPAV or the use of data extraction software, remote access search and surveillance tools ***must be approved and monitored by OTD***."  *Id.* (emphasis added).  Having reasonably concluded that OTD would have any records responsive to this request, *see id.*, the FBI was not required to conduct a separate and highly burdensome search of all its individual field offices and other components for records that, if they existed at all, would logically be

duplicative of the materials in OTD's possession.  *See Pub. Citizen, Inc. v. U.S. Dep't of Educ.*, 292 F. Supp. 2d 1, 8 (D.D.C. 2003)  (explaining that an agency "is not required to search a second set of records that would reveal information duplicative of that found in records already searched"); *accord Blanton v. U.S. Dep't of Justice*, 63 F. Supp. 2d 35, 41 (D.D.C. 1999).

More specifically, Plaintiffs fault the FBI for not searching the CRS for documents responsive to the Group 1 requests.  Opp. at 15.  As discussed further below, the FBI since has searched the CRS using broader terms.  And because the FBI logically concluded that OTD would have all documents responsive to the Group 1 requests, a separate CRS search was not needed.

More fundamentally, and as Defendants previously explained, Plaintiffs' Group 1 requests simply did not lend themselves to a CRS search.  The CRS is indexed using terms that are useful to a particular investigation or that contain items such as names of individuals, organizations, companies, publications, activities, or foreign intelligence matters or programs. Hardy Decl. ¶ 36.  Plaintiffs argue that "specific instances of the FBI impersonating the news media to deliver malware to a criminal suspect would arise in connection with 'particular investigative subjects.'"  Opp. at 15.  But even if that were correct, the CRS is simply not organized in a way that lends itself to a search *based on particular techniques and procedures* such as those identified by Plaintiffs.  Second Decl. ¶ 2.  To underscore this point, on May 19, 2016 the FBI ran a CRS search using the search terms "CIPAV" and "media impersonation."  *Id.* ¶ 5.  Notably, this search was far broader than Plaintiffs' Group 1 requests, since it would encompass *any use* of a CIPAV (whether or not that use was accompanied by an effort to impersonate a member of the media).  The search did not yield any responsive records, *id.*, which

simply confirms Defendants' point that the CRS's organization does not lend itself to a search based on the requests Plaintiffs submitted.

Plaintiffs further claim that "[r]ecords released by the FBI also contain other 'positive indications of overlooked materials,'" Opp. at 19 (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 327 (D.C. Cir. 1999)), but this argument lacks merit.  Plaintiffs assert that the FBI should have searched the St. Louis Regional office, pointing to an email from 2007 related to the Seattle/Timberline Incident referencing "ponies of an application for a mobile tracking order, a mobile tracking/PRTT order, and the affidavit supporting the two ***that St. Louis [sic] drafted for a similar type order***."  Opp. at 19 (quotation marks omitted) (emphasis supplied by Plaintiffs).  But although that email may suggest that the St. Louis office drafted "an application for a mobile tracking order, [and] a mobile tracking/PRTT order," nothing in the email indicates nor so much as suggests that this order involved impersonation of a member of the news media or would otherwise be responsive to Plaintiffs' Requests (much less suggests that such an order, if responsive, would not have been routed through OTD as FBI policy requires).  *See also* Second Decl. ¶ 9.  Similarly, Plaintiffs point to a recent District of Massachusetts court filing in which the Government acknowledged using "network investigative techniques" ("NITs") in the Timberline case and in two other matters for which the relevant warrants were unsealed.  Opp. at 19-20.  That filing explains that "NITs allow investigators to ascertain information from a computer on which the NIT runs such as the Internet Protocol address of the computer despite attempts by the computer user to obscure that information," but does not reference media-impersonation.  *United States v. Levin*, No. 1:15-cr-10271-WGY (D. Mass. Apr. 1, 2016), ECF No. 63 at 1.

More broadly, there is no basis for Plaintiffs persistent assumption that the FBI necessarily has records of supposed media-impersonation incidents that its search failed to uncover. *See, e.g.*, Opp. at 12 (purporting to express shock at the FBI's "release of ***no records*** relating to instances of FBI impersonation of the news media other than the Seattle/Timberline Incident" (emphasis in original)). Plaintiffs point to a number of news articles reporting on the Timberline incident, correspondence from news media organizations and members of Congress, and various statements from FBI officials. *See* Opp. at 4-6. But nothing in Plaintiffs' sources suggest that the activities that are the subject of Plaintiffs' FOIA requests are commonly practiced within the FBI. Indeed, the best evidence Plaintiffs are able to muster on this front is an account from an FBI Special Agent that impersonation of the media "happens in ***very rare*** circumstances," Opp. at 5 (quotation marks omitted), certainly not the sort of statement suggesting the existence of additional responsive documents that any adequate search would necessarily uncover. At bottom, Plaintiffs' arguments on this score amount to nothing more than "[m]ere speculation that as yet uncovered documents might exist," which "does not undermine the finding that the agency conducted a reasonable search for [records]." *SafeCard Servs., Inc. v. S.E.C.,* 926 F.2d 1197, 1201 (D.C. Cir. 1991).

Plaintiffs' remaining criticisms of the FBI's search are equally misplaced. Plaintiffs fault the FBI for searching "in its CRS and ELSUR indices using only three keywords relating solely to the Seattle/Timberline Incident: 'Timberline,' 'Timberline High School' and 'Timberline Highschool.'" Opp. at 16. But Plaintiffs do not explain why these search terms would not reasonably be expected to capture all CRS and ELSUR records related to that incident and, indeed, the fact that the CRS and ELSUR searches did not yield any documents that were not uncovered in the FBI's prior search efforts further underscores that those efforts were adequate.

*See* Defendant's Memorandum of Points and Authorities in Support of their Motion for Summary Judgment ("Mem.") at 8.  And although Plaintiffs criticize the FBI for searching the CRS and ELSUR indices using only terms relating to the Timberline incident, that is because the CRS is indexed based on specific individuals, events, organizations, or other particular subjects of investigative interest, and the Timberline incident was the only specific investigation referenced in the FOIA Requests (and as noted above, the FBI did subsequently search the CRS using broader terms and no responsive documents were found).  Plaintiffs also fault the FBI for failing to produce any materials post-dating the "Situation Action Background" documents (dated October 29 and 31, 2014), declaring that "[t]he failure to produce documents related to the FBI's response to the public outcry over the Seattle/Timberline Incident in 2014 is further evidence that its search was inadequate."  Opp. at 19.  But putting aside that "the fact that a particular document was not found does not demonstrate the inadequacy of a search," *Boyd v. Crim. Div. of U.S. Dep't of Justice,* 475 F.3d 381, 391 (D.C. Cir. 2007), here again Plaintiffs offer absolutely nothing—other than their own conjecture—to suggest that such documents exist, much less show that the FBI's search was inadequate.  Plaintiffs also quibble with the FBI's decision to include records relating to the Timberline Incident in Group 2 rather than Group 1, but Plaintiffs offer no plausible explanation as to how that decision could have prejudiced them: Both OTD and the Seattle Field Office were included in the Group 2 searches and the subsequent search of the CRS and ELSUR indices—which yielded no responsive documents not uncovered in the initial searches—further demonstrates that the search was adequate.  *See* Hardy Decl. ¶¶ 43, 57-58.[2]

---

[2] Plaintiffs purport to derive significance from the fact that the FBI stated in 2015 that it had searched the CRS previously and then acknowledged that this assertion was mistaken.  *See* Opp. at 15 & n.4.  Defendants do not understand how this is at all relevant to the parties' current

Plaintiffs finally complain that the FBI failed to specify the temporal limits of its searches, speculating that the agency employed an unreasonable cut-off date.  In fact, for all the searches the FBI conducted, it provided a cut-off date corresponding to the date RIDs initiated the search.  Second Decl. ¶¶ 4, 6 & n.4.  That decision was reasonable and supported by law. *See Schoenman v. F.B.I.*, No. CIV.A. 04-2202CKK, 2009 WL 763065, at *17 (D.D.C. Mar. 19, 2009) (finding reasonable a cut-off date corresponding to date the search was initiated); *accord Public Citizen v. Dep't of State*, 276 F.3d 634, 643-44 (D.C. Cir. 2002) (finding date-of-**request** cut-off unreasonable but suggesting that the State Department consider a "date-of-**search** cut-off" (emphasis in original)).

Because the FBI conducted a reasonable search for responsive records and Plaintiffs' various complaints about that search are without merit, Defendants are entitled to summary judgment on this issue.

## II.     The FBI Properly Withheld Information Pursuant to Exemption 1

As explained in Defendants' memorandum in support of their motion for summary judgment and in the Hardy Declaration, the FBI withheld a very small amount of material— portions of seven pages out of the 267 identified as responsive—that was classified pursuant to Executive Order 13526.  Mem. at 10-11; Hardy Decl. ¶¶ 64-72.  Judicial review of these Exemption 1 withholdings is limited.  "Information concerning matters of national security is exempt from disclosure under FOIA Exemption 1 so long as the information satisfies the substantive and procedural criteria set forth in an Executive Order."  *Shapiro v. U.S. Dep't of Justice*, 37 F. Supp. 3d 7, 23 (D.D.C. 2014). "Substantive review of classification decisions,"

---

motions and Plaintiffs provide no persuasive explanation for their suggestion that the FBI's initial mistake and subsequent correction of the record somehow "raise[s] a material issue of fact regarding the adequacy of the FBI's search."  *Id.* at 15 n.4.

moreover, "is quite deferential." *Washington Post v. United States Dep't of Defense*, 766 F. Supp. 1, 6 (D.D.C. 1991). Courts "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). This is especially true "in a national security case, in which the agency possesses necessary expertise to assess the risks of disclosure," *Schlesinger v. CIA*, 591 F. Supp. 60, 67 (D.D.C. 1984), and courts "lack the expertise necessary to second-guess . . . agency opinions," *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980).

The Hardy Declaration establishes that Mr. Hardy is an original classification authority and that the information withheld is under the control of the United States government; the Declaration, moreover, avers that Mr. Hardy ensured that all of the procedural requirements of Executive Order 13526 were followed, including proper identification and marking of documents. *See* Hardy Decl. ¶¶ 2, 67-68. The Declaration further establishes that the withheld material contains information pertaining to intelligence sources and methods, *id.* ¶ 70, an authorized basis for classification, *see* Executive Order 13526 § 1.4(c). The original classification authority (Mr. Hardy) determined that release of this information reasonably could be expected to cause serious damage to the national security of the United States, and therefore should be classified at the "Secret" level. Hardy Decl. ¶¶ 70, 72. Because the Hardy Declaration satisfies the FBI's burden to justify its Exemption 1 withholdings, Defendants are entitled to summary judgment on those withholdings. Plaintiffs' contrary arguments are unpersuasive and certainly "do[] not overcome the '***substantial weight***' the court must accord 'to an agency's affidavit concerning the details of the classified status of the disputed record.'" *Morley v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007) (quoting *Military Audit Project*, 656 F.2d at 738) (emphasis originally supplied by *Military Audit Project*).

Urging otherwise, Plaintiffs assert that "there is a genuine issue of material fact as to whether the FBI satisfied the procedural requirements of Executive Order 13526" because different procedural requirements purportedly apply where, as here, classification of the relevant material occurs after the agency's receipt of a FOIA request seeking that material.  *See* Opp. at 27.  Even if this assertion did raise a genuine issue of material fact concerning the applicability of Exemption 1, Defendants would still be entitled to summary judgment with respect to this material since the same information was properly withheld under Exemption 3 pursuant to the National Security Act of 1947, 50 U.S.C. § 3024(i)(l).  *See* p. 16, *infra*; Second Decl. ¶ 11.

In any event, Plaintiffs' allegation of procedural deficiencies lacks merit.  Plaintiffs primarily rely, *see* Opp. at 32-33, on Section 1.7(d) of Executive Order 13526, which states that "[i]nformation that has not previously been disclosed to the public under proper authority may be classified or reclassified after an agency has received" a FOIA request "only if  [classification] is accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under section 5.4 of this order" (and classification otherwise meets the requirements of the Executive Order).  Executive Order 13526 § 1.7(d).  But in fact, all material withheld pursuant to Exemption 1 was classified prior to the FOIA Requests in this case, and the requirements of Section 1.7(d) thus do not apply.  Second Decl. ¶ 13.  In any event, the designated senior agency official within the Department of Justice for purposes of  Executive Order 13526 § 1.7(d) is the Assistant Attorney General for Administration, *see* 28 C.F.R. § 17.11(a); *Mobley v. CIA*, 806 F.3d 568, 585 (D.C. Cir. 2015); Second Decl. ¶ 13, and "the Assistant Attorney General for Administration ***delegated*** his § 1.7(d) authority to the chief of the FBI's Document Classification Unit," *Mobley*, 806 F.3d at 585 (emphasis added); *see also* Second Decl. ¶ 13.  Mr. Hardy, as

RIDS's chief of the Document Classification Unit, was authorized to (and did) conduct a document-by-document review of these materials and those materials have also not been previously disclosed to the public.  Second Decl. ¶ 13.  Plaintiffs also highlight that "some of the Government's Exemption 1 withholdings appear in documents that are clearly labeled "'SENSITIVE BUT UNCLASSIFIED.'"  Opp. at 29.  But "this simply reflects that the originator of the documents inadvertently failed to recognize the classified nature of the material."  Second Decl. ¶ 14.  Mr. Hardy determined that the information met the standards for classification under E.O. 13526, *see id.*, as he was fully authorized to do.  Defendants have failed to raise a genuine issue of material fact as to whether the FBI satisfied the procedural requirements of Executive Order 13526.

Plaintiffs' assertion that the FBI failed to establish that the withheld information falls within a category of information that may be classified under section 1.4 of Executive Order 13526 is equally unpersuasive.  Plaintiffs assert that the FBI's Exemption 1 showing "amounts to nothing more than the mere boilerplate assertion that the records' release would endanger national security," *see* Opp. at 29, but that is not so.  The Hardy Declaration explains that "the FBI protected information pertaining to specific FBI[] intelligence sources and methods, including [the FBI's] intelligence gathering capabilities."  Hardy Decl. ¶ 70.  The Declaration goes on to explain that "the sources and methods described in these records are used by the FBI in current national security investigations," *id.*, and that, to qualify as an intelligence activity or method, information must be "needed by U.S. intelligence/counterintelligence agencies to carry out their missions" and "confidentiality must be maintained with respect to the activity or method if the viability, productivity and usefulness of its information is to be preserved," *id.* ¶ 69.  To prevail on an Exemption 1 claim, "little proof or explanation is required beyond a

plausible assertion that information is properly classified." *Morley*, 508 F.3d at 1124.   The

Hardy Declaration easily clears this low bar.   *See Elec. Frontier Found. v. U.S. Dep't of Justice*,

892 F. Supp. 2d 95, 99-100 (D.D.C. 2012) (declaration sufficient where it stated, among other

things, that information concerned "actual intelligence activities, sources or methods . . ." and

"intelligence-gathering capabilities used by the FBI to gather specific information on targets of

national security investigations," and further averred that "the disclosure of such information

could reasonably be expected to cause serious damage to national security by . . . allow[ing]

hostile entities to discover the current methods and activities used . . ." (quotation marks

omitted)), *aff'd sub nom.*, 739 F.3d 1 (D.C. Cir. 2014); *Shapiro*, 37 F. Supp. 3d at 25 (declaration

sufficient because "[i]t defines what constitutes an intelligence activity or method, and describes

with reasonable detail the information withheld so as to demonstrate that Exemption 1 applies

without revealing the exact information at issue") (internal citation omitted).

Although Defendants believe that the Hardy Declaration sufficiently described the

limited information withheld pursuant to Exemption 1, Mr. Hardy's Second Declaration provides

additional detail concerning the content of this material.   *See* Second Decl. ¶ 11.   As that

Declaration explains, the classified material on four of the six pages

> [C]onsists of highly specific details—not previously disclosed to the public—
> concerning the information previously collected by the FBI on a specific targeted
> third party individual determined to be of a national security interest; the FBI's
> planned execution of an operation to, *inter alia*, access the computer of the
> specific targeted individual; the information to be collected concerning the
> specific targeted individual; highly technical details concerning how that
> information would be collected; and the specific records of the targeted
> individual's activities learned as a result of the operation.

*Id.*   The classified information on the remaining pages "contains a detailed collection of

information concerning the FBI's deployment of the [CIPAV], including specific details

concerning the technical information collected using that tool, various ways the tool can be

tailored, limitations associated with the tool, and the manner in which collected data may be viewed by FBI personnel." *Id.* That description, together with the statements in Mr. Hardy's initial declaration, is more than sufficient to satisfy Defendants' obligation to provide "a plausible assertion that information is properly classified." *Morley*, 508 F.3d at 1124. Summary judgment on the Exemption 1 withholdings is warranted.

## III.    The FBI Properly Withheld Information Pursuant to Exemption 3

The FBI also properly withheld, under Exemption 3, portions of seven pages pursuant to 50 U.S.C. § 3024(i)(l). Hardy Decl. ¶ 76 n.24. Exemption 3 permits withholding of records that are "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). Under this exemption, the FBI "need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute." *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009). The FBI has met both of these two requirements.

As to the first requirement, Plaintiffs acknowledge that Section 3024(i)(1) is a valid Exemption 3 statute. *See* Opp. at 29. And as to the second, Plaintiffs' only response to the FBI's invocation of Section 3024(i)(1)—which requires the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure"—is that the FBI supposedly has not shown "that the withheld material would purportedly reveal 'intelligence sources and methods.'" *Id.* at 30. As noted in the previous section, however, the Hardy Declaration and Second Declaration amply establish that the material withheld under Exemption 1 (the same material withheld pursuant to Section 3024(i)(1) under Exemption 3) contains information regarding intelligence sources and methods. *See* pp. 14-15, *supra*. The Exemption 3 analysis is no less deferential. "[T]he CIA has 'very broad authority to protect all sources of

intelligence information from disclosure.'" *Whitaker v. CIA*, 64 F. Supp. 3d 55, 63-64 (D.D.C. 2014) (quoting *CIA v. Sims*, 471 U.S. 159, 168-69 (1985)). "Because of this 'sweeping power,' courts are required to give 'great deference' to the CIA's assertion that a particular disclosure could reveal intelligence sources or methods." *Id.*; *see also Am. Ass'n of Women, Inc. v. U.S. Dep't of Justice*, --- F. Supp. 3d ----, 2016 WL 958147, at *5 (D.D.C. 2016) ("deferring to Mr. Hardy's declaration" that "I have determined that the FBI's intelligence sources and methods would be revealed if any of the withheld information is disclosed to plaintiffs, and thus, the FBI is prohibited from disclosing the information under 50 U.S.C. § 3024(i)(1)"); *compare* Hardy Decl. ¶ 76 ("I have determined the FBI's intelligence sources and methods would be revealed if any of the withheld information is disclosed to Plaintiffs, and thus, the FBI is prohibited from disclosing the information under 50 U.S.C. § 3024(i)(l)."). Defendants are thus entitled to summary judgment concerning the materials withheld pursuant to Section 3024(i)(1), even if the Court were to conclude (which it should not) that there is a genuine issue of material fact as to whether these same materials were properly classified under Exemption 1.

The FBI also withheld portions of six pages pursuant to the Pen Register Act, 18 U.S.C. § 3123(d). Hardy Decl. ¶ 77 n.27. In response, Plaintiffs contend that the Pen Register Act is inapplicable to the responsive records here because "the Government did not apply for a PRTT under 18 U.S.C. § 3122 in connection with the Seattle/Timberline Incident. Instead, the Government applied for—and was granted—a search warrant." Opp. at 31. Plaintiffs further argue that "the court order at issue in the Seattle/Timberline case has already been unsealed and is publicly available . . ." *Id.* at 31-32. Having considered the issue further, Defendants agree with Plaintiffs that the Pen Register Act does not apply to the information withheld in category

(b)(3)-2. The search warrant Plaintiffs reference sought approval to install a pen register,[3] and other portions of the redacted materials supplied to Plaintiffs reference a pen register.[4] But having reviewed the files related to the Timberline incident, Defendants acknowledge that the relevant court order has been unsealed, and are withdrawing their Exemption 3 claims pursuant to the Pen Register Act. *See* Second Decl. ¶ 16. But although Section 3123(d) does not apply to these records, the records nonetheless reveal non-public details regarding Pen Register and Trap and Trace devices as a contemplated law enforcement technique in the investigation at issue and were thus properly withheld under Exemption 7(E). *Id.* Defendants discuss this exemption category later in this brief.

## IV. The FBI Properly Withheld Information Pursuant to Exemption 5

As set forth in Defendants' memorandum in support of their motion for summary judgment and in the Hardy Declaration, the FBI withheld material under the deliberative process privilege on six of the 267 responsive pages (RCFP-25, 26, 27, 30, 51, and 52). *See* Mem. at 16-17; Hardy Decl. ¶ 82. Specifically, the FBI withheld (1) "information in emails between FBI's attorneys and other FBI personnel discussing matters pertaining to the application of an investigative technique" and (2) "a report containing information discussing legal issues regarding the Timberline School Investigation." Hardy Decl. ¶ 82.

Although Plaintiffs purport to challenge all of the FBI's deliberative process withholdings, *see* Opp. at 33-34, they offer no meaningful challenge to the FBI's deliberative process withholdings in the emails. And the redacted pages provided to Plaintiffs show that, on

---

[3] *See* ECF No. 19-19 at 6 (stating that "this [is] an application for a search warrant and pen register").

[4] ECF No. 19-19 at 15 (explaining that "the CIPAV will function as a pen register device and record the routing and destination addressing information for electronic communications originating from the activating computer"); *id.* at 16 (noting that "[t]he pen register will record IP address, dates, and times of the electronic communications").

those pages, FBI personnel were discussing changes to an application for a search warrant and accompanying affidavit before those materials were submitted to a court.  *See* ECF No. 19-25 at 2-5.  These email excerpts were clearly both predecisional and deliberative and were properly withheld pursuant to the deliberative process privilege (as discussed below, they were also properly withheld, either in addition or in the alternative, under the attorney-client privilege).

Plaintiffs argue that information withheld on two pages of the "report containing information discussing legal issues regarding the Timberline School Investigation," Hardy Decl. ¶ 82 (RCFP-51-52), is not deliberative process material because the underlying document—a "Situation Action Background" document discussing legal issues regarding the Timberline School Investigation—was prepared after the investigation concluded.  Opp. at 34; *see also* ECF No. 19-27.  But as Mr. Hardy's Second Declaration explains, the withheld material "concerns opinions and recommendation of an advisory nature about FBI authority and policy evaluated in the light of the Timberline investigation, but not adopted by the agency as final policy."  Second Decl. ¶ 18.  In any event, RCFP-52 was also withheld in full under the attorney-client privilege and Exemption 7(E), and the FBI may properly rely on the attorney-client privilege to withhold the portions of RCFP-51 that were initially withheld only pursuant to the deliberative process privilege, "as it contains the discussion of legal advice and analysis provided by the Cyber Law Unit, an element of OGC."  *Id.*

Defendants likewise properly withheld information on five pages (RCFP-25, 26, 27, 30, and 52) pursuant to the attorney client privilege (and as noted above, now also assert it on the portions of RCFP-51 previously withheld only pursuant to the deliberative process privilege).  Hardy Decl. ¶ 84 & n.29.  The material withheld in this category is largely the same material withheld pursuant to the previous category:  the FBI withheld the identical email excerpts on

RCFP-25, 26, 27, and 30 that it withheld pursuant to the deliberative process privilege and it withheld one page of the same Situation Action Background document (RCFP-52) pursuant to both privileges (the FBI also withheld RCFP-52 pursuant to Exemption 7(E)).  A review of the redacted pages provided to Plaintiffs makes clear that the emails are core attorney-client privileged material, consisting of communications between an FBI Special Agent, an attorney in the FBI's Office of General Counsel, and other FBI personnel concerning the preparation of an application for a search warrant and accompanying affidavit in a specific case.  *See* ECF No. 19-25; *see also id.* at 3 (email from FBI attorney stating "[h]ere are my comments on my legal review of the application for a search warrant in this case" and redacting subsequent material); *id.* (email stating that "I made the changes we discussed earlier," and redacting material immediately thereafter).

Plaintiffs' objections to these withholdings are unpersuasive.  Plaintiffs note that the emails contain no "Confidential" designation, Opp. at 35, but "an express request for confidentiality is not required" to invoke the privilege, *In re Sealed Case*, 737 F.2d 94, 102 (D.C. Cir. 1984).  FBI personnel were thus not required to mark every internal email as confidential to preserve the privilege, particularly since it is obvious on the face of the documents that the withheld material reflects confidential communications concerning a legal matter.  Plaintiffs' assertion that the emails "have many recipients from multiple offices," Opp. at 35 is immaterial and certainly insufficient to rebut the Hardy Declaration's representation (which is also apparent on the face of the redacted documents) that the communications "were made in confidence and for the purpose of formulating and dispensing legal advice."  Hardy Decl. ¶ 84.  And the material withheld pursuant to the attorney-client privilege in the Situation Action Background document is contained within a document discussing legal issues regarding the Timberline School

Investigation and in a section entitled "Legal Analysis."  This withheld material likewise reflects confidential communications made for the purpose of formulating legal device.  *Id.*  The FBI is entitled to summary judgment as to these withholdings.

## V.  The FBI Properly Withheld Information Pursuant to Exemptions 6 & 7(C)

Under Exemptions 6 and 7(C), the FBI withheld the names and/or identifying information of FBI special agents and support personnel, other non-FBI federal government personnel, and local law enforcement personnel who aided the FBI.  *See* Hardy Decl. ¶¶ 87-89, 92.  The FBI also withheld the names and/or identifying information of three categories of third parties.  Hardy Decl. ¶¶ 90-91, 93.  Plaintiffs state that they are not challenging the third-party withholdings (albeit begrudgingly, and not without a wholly gratuitous and insubstantial attack on the FBI[5]), but are challenging the remaining withholdings.  Opp. at 36.  The FBI is entitled to summary judgment on all of the material withheld pursuant to Exemptions 6 and 7(C).

Initially, Plaintiffs contend that "the Government make[s] no threshold showing that emails . . . from which the FBI has withheld information, are 'personnel and medical files' or 'other similar files' within the meaning of Exemption 6."  Opp. at 37.  This contention is meritless.  Congress intended the phrase "similar files" to have "a broad, rather than a narrow, meaning."  *United States Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 600 (1982).  "[T]he

---

[5] Defendants are at a loss to understand Plaintiffs' contention that "the Government has failed to provide any factual support for its contention that disclosure of the identities of third parties of investigative interest, third-party victims, or other third parties mentioned would, in fact, result in harassment, embarrassment, or stigma."  Opp. at 36.  It is entirely obvious that crime victims and individuals connected to a criminal investigation (whether or not those individuals are subjects of the investigation) have privacy interests in protection of their personal information, and courts have endorsed withholding of similar information.  *See* Mem. at 22-23 (citing cases); *SafeCard Servs.*, 926 F.2d at 1206 (holding that "unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure").

threshold for application of Exemption 6 is crossed if the information merely 'applies to a particular individual,'" a "minimal" requirement. *New York Times Co. v. Nat'l Aeronautics & Space Admin.*, 920 F.2d 1002, 1006 (D.C. Cir. 1990). That prerequisite is clearly met with respect to the names and identifying information the FBI withheld here.[6] But even if this argument had merit, it is immaterial. Plaintiffs do not appear to dispute that these records were compiled for law enforcement purposes, *see* Hardy Decl. ¶¶ 57-58, and the records thus unquestionably fall within the ambit of Exemption 7(C) (which imposes no such requirement).

Because the records were compiled for law enforcement purposes, the Court must balance the privacy interests of the individuals with the public interest in disclosure. *See Beck v. Dep't of Justice*, 997 F.2d 1489, 1491 (D.C. Cir. 1993). Judged against these standards, the FBI is entitled to summary judgment on its Exemption 7(C) withholdings. "Names and/or identifying information are often granted categorical exemption under 7(C)." *Brown v. F.B.I.*, 873 F. Supp. 2d 388, 404 (D.D.C. 2012); *see also Barnard v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 13-14 (D.D.C. 2009); *Schoenman v. F.B.I.*, 576 F. Supp. 2d 3, 13 (D.D.C. 2008). And as the Hardy Declaration explains, the FBI special agents and support personnel, non-FBI federal government personnel, and local law enforcement personnel whose information is contained in the responsive records have substantial privacy interests in non-disclosure of their personal data. Disclosing the identities of those involved in investigations could trigger hostility towards them and subject them to possible revenge by the investigations' targets. Hardy Decl. ¶ 88. Disclosure could also

---

[6] Plaintiffs frame the question as whether the "emails" containing identifying information are similar files, Opp. at 37, but "in applying the threshold test, [courts] look not to the nature of the files that contain the information sought in a FOIA request, but to the nature of the information requested." *New York Times Co.*, 920 F.2d at 1006; *see also Washington Post Co. v. HHS*, 690 F.2d 252, 260 (D.C. Cir. 1982) (nature of the test "ensures that FOIA's protection of personal privacy is not affected by the happenstance of the type of agency record in which personal information is stored").

subject the individuals to harassment and unwanted inquiries, particularly since many were (and possibly still are) in positions of access to information regarding law enforcement investigations. *Id.* And if individual identities and identifying information were disclosed, the resulting publicity could prejudice those individuals' effectiveness in conducting and assisting in other investigations. *Id.* ¶ 87; *see also id.* ¶¶ 89, 92 (noting that the justifications for withholding information concerning non-FBI federal government personnel and local law enforcement personnel are the same as the justifications for withholding information concerning FBI Special Agents and support personnel). These are precisely the sorts of harms courts have accepted in other cases.[7]

In any event, this Court need not determine the precise extent of the privacy interests asserted by the FBI here—substantial, modest, or something in between—because Plaintiffs simply cannot point to *any* public interest in release of this material that is cognizable under Exemptions 6 and 7(C). *See Brown*, 873 F. Supp. 2d at 403 (stating that "the likelihood of disruptive and harassing phone calls" that would result from release of FBI Special Agent phone numbers was "debatable," but concluding that "the Court need not decide exactly how much privacy is being invaded" because "*[a]ny* amount of privacy expectation outweighs the virtually nonexistent public interest" in this information (emphasis in original)). "[T]he only public interest relevant for purposes of Exemption 7(C) is one that focuses on the citizens' right to be

---

[7] *See, e.g.*, *Baez v. U.S. Dep't of Justice*, 647 F.2d 1328, 1339 (D.C. Cir. 1980); *Moore v. Bush*, 601 F. Supp. 2d 6, 14 (D.D.C. 2009) ("Generally, government employees and officials, especially law enforcement personnel, have a privacy interest in protecting their identities because disclosure 'could subject them to embarrassment and harassment in the conduct of their official duties and personal affairs.'" (citation omitted)); *Brown*, 873 F. Supp. 2d at 403 (finding that FBI Special Agents' internal telephone numbers were properly withheld under Exemption 7(C) based on declaration stating that disclosure "could subject these individuals to harassing telephone calls" (quotation marks omitted)); *Stone v. FBI*, 727 F. Supp. 662, 664, 666 (D.D.C. 1990) (concluding that even old grudges toward FBI officials can pose risk of harassment if names disclosed).

informed about what their government is up to." *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1282 (D.C. Cir. 1992).  "Even if a particular privacy interest is minor, nondisclosure remains justified where . . . . the public interest in disclosure is virtually nonexistent." *Id.*

The information the FBI has withheld pursuant to Exemptions 6 and 7(C) does not implicate that public interest.  Plaintiffs insist that "[t]he FOIA Requests at issue in this case pertain to a matter of substantial public concern:  the FBI's practice of impersonating members of the news media in connection with criminal investigations." Opp. at 39.  But whether the ***subject matter*** of Plaintiffs' FOIA Requests pertains to a matter of substantial public concern (an issue on which Defendants express no opinion here) is not the relevant question—the question is ***whether disclosure of the identities and related information*** of the FBI Special Agents and other personnel would inform the citizenry of what their government is up to.  It would not.

Indeed, Plaintiffs do not attempt to explain how learning the identifying information of these individuals—who are not involved in the formation of agency policy, *see* Second Decl. ¶ 21—would shed light on the alleged practices at issue, or otherwise inform the public of what the FBI is up to.  Nor have Plaintiffs explained what they would even do with this information if they received it. To the extent Plaintiffs might suggest that they would attempt to communicate with these individuals or publicize their identities and contact information, that simply confirms the FBI's well-grounded conclusion that disclosure of this information could subject the individuals to harassment and unwanted inquiries.  *See Schoenman*, 576 F. Supp. 2d at 13 (making this point).  Courts have repeatedly concluded that similar information was properly withheld (even where the individuals had engaged in wrongdoing, which is not the case here). *See, e.g.*, *id.* (concluding that an "FBI agent's name itself 'reveals little or nothing about an agency's own conduct'" and that "thus the public has no cognizable interest in the release of

24

such information"; *Beck*, 997 F.2d at 1493 ("The identity of one or two individual relatively low-level government wrongdoers, released in isolation, does not provide information about the agency's own conduct.").[8]   Similarly here, Plaintiffs have not—and cannot—explain how the identifying information they seek implicates the public interest relevant to Exemption 7(C).

## VI.    The FBI Properly Withheld Information Pursuant to Exemption 7(E)

Finally, as detailed in Defendants' summary judgment papers, the FBI properly withheld six specific categories of information pursuant to Exemption 7(E).   Hardy Decl. ¶¶ 96-103. Initially, although Plaintiffs briefly note the FBI's withholding of internal secure fax numbers and phone numbers, *see* Opp. at 39, they offer no argument concerning these withholdings and accordingly have waived any challenge relating to them.   Notwithstanding Plaintiffs' arguments, the FBI's withholding of the five remaining categories of information pursuant to this Exemption was likewise proper.

1.     First, the FBI properly withheld portions of 34 pages consisting of operational directives that inform and instruct FBI employees on how to properly use certain sensitive, non-

---

[8] *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246 (D.D.C. 2005), on which Plaintiffs rely, *see* Opp. at 38, is not to the contrary.  As a threshold matter, the district court did not consider the names and work telephone numbers at issue there under Exemption 7(C) standards (under which the balance tilts more heavily in favor of nondisclosure), because it concluded that those numbers were not compiled for law enforcement purposes.  *See* 404 F. Supp. 2d at 257.  The Court in *Leadership Conference* also noted that the relevant "names and work telephone numbers are already publicly available from the Office of Personnel Management."  *Id.*  But to the extent *Leadership Conference* suggests more broadly that names and other identifying information cannot properly be withheld under Exemption 6 (or under Exemption 7(C)), the decision is inconsistent with the weight of authority identified above, and should not be followed here.  *Compare Leadership Conference*, 404 F. Supp. 2d at 257 (stating that "[a] name and work telephone number is not personal or intimate information, such as a home address or a social security number, that normally would be considered protected information under FOIA Exemption 6"), *with Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989) ("The Supreme Court has made clear that Exemption 6 is designed to protect personal information in public records, even if it is not embarrassing or of an intimate nature.").

public techniques and guidance for conducting investigations (and, in providing this instruction, identifies the sensitive, non-public procedures, techniques, and strategies at issue).  Hardy Decl. ¶ 96.[9]  The Hardy Declaration explained that "the protected information falls within both subtypes of 7(E): law enforcement techniques and procedures and law enforcement guidelines." *Id.*  Although Plaintiffs accuse the FBI of "elid[ing] an important statutory distinction between these categories," Opp. at 40—because withholding law enforcement guidelines requires a showing that disclosure could reasonably be expected to risk circumvention of the law—the FBI has made such a showing here.  As the Hardy Declaration explained, if the FBI were to provide such "a unique look inside the FBI's law enforcement and national security 'playbooks,'" criminals and potential lawbreakers could predict how the FBI might respond to certain criminal and suspicious activities, learn the techniques the agency would likely employ in response to those activities, and would be able to preemptively modify their behavior to evade detection. Hardy Decl. ¶ 96.  Courts have accepted similar descriptions in sustaining Exemption 7(E) claims.  *See* Mem. at 28 (collecting cases).  Indeed, so did the D.C. Circuit case on which Plaintiffs purport to rely.  *See* Opp. at 40-41.[10]

---

[9] Plaintiffs note that the FBI asserted this category as a basis for withholding a page from one of the two "Situation Action Background" documents.  Opp. at 40.  Although the Hardy Declaration omitted this page (RCFP-52) in its description of the documents containing information falling within this category, the Declaration correctly included this page in the list of pages in which this category was asserted, *see* Hardy Decl. ¶ 96 n.37, and the description of information falling within this category applies to that page as well (which in fact discusses information from the FBI's Domestic Investigations and Operations Guide, *see* Second Decl. ¶ 23).

[10] *See PHE, Inc. v. U.S. Dep't of Justice*, 983 F.2d 248, 251 (D.C. Cir. 1993) (approving FBI's withholdings where affidavit explained, inter alia, that withheld information "detailed specific documents, records and sources of information available to Agents investigating obscenity violations, as well as the type of patterns of criminal activity to look for when investigating certain violations," and that release would risk circumvention of the law because "[k]nowing what records or documents are likely to be scrutinized by the FBI and who would be a good source of information provides violators with an opportunity to impede lawful investigations by

2.     Plaintiffs' challenge to the withholdings in category (b)(7)(E)-2 is equally unpersuasive.   As the Hardy Declaration explains, the withheld information in this category consists of non-public information about a specific undercover operation conducted by the FBI, including the specific techniques used in that operation.   Hardy Decl. ¶ 97 & n.38.   Mr. Hardy's Second Declaration further notes that "[t]he protected information contains detailed descriptions of aspects such as logistic, methods, strategies, and tools used."   Second Decl. ¶ 24.   Plaintiffs criticize the FBI's assertion that release of this information "could have devastating operational consequences and would jeopardize future use of undercover operations by the FBI in similar cases or under similar circumstances," Opp. at 41 (quoting Hardy Decl. ¶ 97); *id.* at 42, but it is obvious that the FBI's disclosure of non-public details concerning its execution of specific undercover operations would have this effect, and the Hardy Declaration's conclusion that release of this information would risk circumvention of the law is logical and well supported. *See also* Second Decl. ¶ 24 ("Release of the intricacies of undercover operation and related information would nullify the use of such a valuable technique in future undercover investigations.").

3.     The FBI also withheld information comprising non-public details concerning its deployment of the CIPAV, in addition to other techniques and procedures used by the FBI in criminal and national security investigations.   Hardy Decl. ¶¶ 99-100 & n.40.   Plaintiffs criticize the FBI's withholding of information relating to CIPAV on the grounds that "there is, in fact, a great deal of information about this technology that is publicly known."   Opp. at 42.   The FBI re-reviewed the information asserted as protected under this category and determined that additional information could be segregated and released.   Second Decl. ¶ 25.   "The information the FBI is

---

destroying or altering evidence and possibly rendering harm to sources" (quotation marks omitted)).

still withholding is not known to the public, has not been made public in any prior FOIA releases, and FBI RIDS has no factual basis to conclude that the withheld information otherwise resides in the public domain." *Id.*

4.      The FBI also withheld portions of six pages containing non-public details about targets of FBI pen registers and trap and trace devices ("PRTT").   Hardy Decl. ¶ 101 & n.41. Although Defendants have determined that their original assertion that these records are covered by the Pen Register Act was incorrect, the FBI properly withheld this information pursuant to Exemption 7(E).   The documents at issue contain non-public details concerning the FBI's use of these tools, the disclosure of which would provide criminals with an understanding of when they should expect the FBI to deploy this investigative technique and make it easier for them to develop countermeasures to avoid disruption and detection by the FBI.   *Id.*   As Mr. Hardy's Second Declaration further explains, "[t]he detailed information includes non-public details about the how, why, when, where, and specific circumstances a particular device could be use in certain investigations."   Second Decl. ¶ 16.   Because the records withheld in this category would, if released, enable criminals to circumvent the law, they were properly withheld under Exemption 7(E).

5.      Finally, the FBI properly withheld all or part of 24 pages containing the techniques and procedures it uses to analyze information in connection with criminal and national security investigations.   Hardy Decl. ¶¶ 102-103 & n.42.   Plaintiffs claim that the FBI offered "only generic assertions purporting to justify the Government's assertion of Exemption 7(E)" in this category, *see* Opp. at 43, but that is incorrect.   The Declaration further explains that "[t]he release of this information would disclose the identity of methods used in collecting and analyzing information, including how and from where the FBI collects information, and the

methodologies employed to analyze it."  Hardy Decl. ¶ 102.   And the Declaration logically explains why release of this information could reasonably be expected to cause circumvention of the law, in that disclosure would undermine the effectiveness of those techniques, as well as allow criminals to employ countermeasures to reduce their effectiveness.  *Id.*; *see also* Second Decl. ¶ 27 (explaining that "the FBI protected information pertaining to how it collects information and analyses it, how much value it places on certain pieces of information versus others, its pertinence to a particular investigation, and how it can be utilized to advance an investigation, etc.").   These explanations satisfy the standard required under Exemption 7(E), which does not impose a "highly specific burden of showing how the law will be circumvented, [but only] requires that the [agency] 'demonstrate[] logically how the release of [the requested] information might create a risk of circumvention of the law.'"  *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009).

## VII.    The FBI Released All Reasonably Segregable Information

Plaintiffs also assert that the FBI has not met its segregability obligations.  Opp. at 26. This argument is likewise without merit.  The Hardy Declaration explained that "[a] line by line review was conducted to identify non-exempt information that could be reasonably segregated from exempt information for release."  Hardy Decl. ¶ 104.  The Declaration further noted that, where pages of records were released in part with redactions, the pages contained a mixture of material that could be reasonably segregated for release, *id.* ¶ 105(a), and that, where pages were withheld in full, "there was no information that could be reasonably segregated for release without triggering foreseeable harm to one or more of the cited FOIA exemptions" (or, in the case of 22 pages, the pages were duplicative of other pages processed).  *Id.* ¶ 105(b).  In addition, the Hardy Declaration breaks the exempted material into categories, explaining in detail the

content in each category.  *See* Hardy Decl. ¶¶  60-103 & nn. 20-21, 24, 27-42.  And although Plaintiffs complain that the FBI has failed to provide a sufficient basis for its withholding of the 59 pages withheld in full, included with the Second Declaration is a *Vaughn* index describing— and justifying the withholding of—the 59 pages.  *See* Second Decl. ¶ 10 & Ex. A.  This is sufficient to show that the FBI has complied with its segregability obligations.  *See Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996) (noting that the government meets its obligation so long as it provides an "adequate explanation" showing with "'reasonable specificity' why the documents cannot be further segregated") (quoting *Quinon v. F.B.I.*, 86 F.3d 1222, 1227 (D.C. Cir. 1996)).

Moreover, the nature of the material withheld reinforces the conclusion that Defendants complied with their obligation to disclose all reasonably segregable material.  The records at issue implicate national security concerns and, as explained in the Hardy Declaration, include the FBI's sensitive investigatory techniques and procedures.  *See, e.g.*, Hardy Decl. ¶ 94.  Given the highly sensitive information implicated by Plaintiffs' requests, it is reasonable to conclude that they would contain significant redactions.  *See, e.g.*, *Hodge v. F.B.I.*, 703 F.3d 575, 582 (D.C. Cir. 2013) (concluding the FBI released all reasonably segregable information despite heavy redactions because it is "unsurprising that [the investigative reports at issue] would be heavily redacted given the[ir] sensitive nature").  Summary judgment is warranted.

## VIII.  *In Camera* Review is Unwarranted

Plaintiffs have also filed a separate motion seeking *in camera* review of what it deems a "limited" set of 77 pages of records.  *See* ECF No. 20, Memorandum of Points and Authorities in Support of Plaintiffs' Motion for *In Camera* Review and/or Other Appropriate Relief ("In Camera Mem.") at 6.  This motion should likewise be denied.

FOIA permits district courts to conduct *in camera* review to determine if particular records were properly withheld.  5 U.S.C. § 552(a)(4)(B).  But when an agency meets its burden through declarations, "*in camera* review is neither necessary nor appropriate," and "*[i]n camera* inspection is particularly a last resort in national security situations like this case." *Larson v. Dep't of State*, 565 F.3d 857, 870 (D.C. Cir. 2009) (internal quotation marks omitted); *see also ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 626 (D.C. Cir. 2011) ("*In camera* inspection is particularly a last resort in national security situations like this case—a court should not resort to it routinely on the theory that it can't hurt."  (internal quotation marks omitted)); *Hayden v. National Security Agency*, 608 F.2d 1381, 1387 (D.C. Cir. 1979) ("*In camera* review is a 'last resort' to be used only when the affidavits are insufficient for a responsible De novo decision."). Because the initial Hardy Declaration as well as the Second Declaration submitted with this brief show that the FBI's invocation of FOIA exemptions is well supported, this is not the rare case in which *in camera* review is necessary as a "last resort."

In addition, the specific documents Plaintiffs have proposed for *in camera* review further highlight that such review is unwarranted here.  Plaintiffs request that this Court review ***all*** of the pages the FBI withheld in full, purportedly because the Hardy Declaration fails to provide a sufficient description of these materials or an explanation of why they were withheld in full.  In Camera Mem. at 7.  Plaintiffs' criticism of the Hardy Declaration in this motion (and throughout their opposition brief) is without merit.  The *Vaughn* showing the FBI submitted in the Hardy Declaration—which includes coded categories of exemptions detailing the nature of information withheld pursuant to the applicable FOIA exemption(s), as well as a summary of the bases for withholdings—is consistent with the FBI's common practice in this District, and courts in the District of Columbia and elsewhere have repeatedly accepted similar submissions from the FBI

and from other agencies.[11]  To the extent Plaintiffs intended to suggest that the FBI was required

to submit a separate index describing particular materials, that argument is also without merit.[12]

But notwithstanding the lack of merit in Plaintiffs' criticisms, the FBI is providing a separate

Index with Mr. Hardy's Second Declaration that further describes the documents withheld in full

and the FBI's bases for withholding them.  *See* Second Decl. ¶ 10 & Ex. A.  *In camera* review of

these materials is unwarranted.

Nor have Plaintiffs shown a basis for *in camera* review of the other two categories of

materials.  Plaintiffs ask this Court to review the seven pages of which the FBI withheld portions

under Exemption 1 (as well as Exemptions 3, 6, 7(C), and 7(E)), purportedly because Defendants

have not supplied an adequate basis for the portions' classification.  *See* In Camera Mem. at 8.

But as detailed above, the Hardy Declaration and Second Declaration easily satisfy the FBI's

minimal burden to justify its classification decisions (and Plaintiffs' fixation on the labeling of

these materials is misplaced).  *See* pp. 13-15, *supra*.  Finally, Plaintiffs do not identify any

irregularities in the FBI's treatment of the Situation Action Background document that would

---

[11] *See, e.g.*, *Morley*, 508 F.3d at 1122; *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 349-50 (D.C. Cir. 1987); *Blanton v. U.S. Dep't of Justice*, 64 F. App'x 787, 789 (D.C. Cir. 2003); *Maynard v. CIA*, 986 F.2d 547, 559 & n.13 (1st Cir. 1993); *Jones v. FBI*, 41 F.3d 238, 242-43 (6th Cir. 1994); *Queen v. Gonzales*, No. Civ. A. 96-1387, 2005 WL 3204160, at *3 (D.D.C. Nov. 15, 2005).

[12] *See, e.g.*, *Maydak v. U.S. Dep't of Justice*, 218 F.3d 760, 766 (D.C. Cir. 2000) (noting that the D.C. Circuit has upheld "assertion of FOIA [exemption 5] based on something less than a *Vaughn* index"); *Gallant v. NLRB*, 26 F.3d 168, 173 (D.C. Cir. 1994) (noting that "materials provided by the agency may take any form so long as they give the reviewing court a reasonable basis to evaluate the claim of privilege"); *Voinche v. FBI*, 412 F. Supp. 2d 60, 65 (D.D.C. 2006) (stating that "agency does not have to provide an index per se, but can satisfy its burden by other means, such as submitting the documents in question for an in camera review or by providing a detailed affidavit or declaration") (emphasis omitted); *Hornbeck Offshore Transp., LLC v. U.S. Coast Guard*, No. 04-1724, 2006 WL 696053, at *6 (D.D.C. Mar. 20, 2006) (explaining that if materials submitted provide a "reasonable basis to evaluate the claim of privilege, the precise form of the agency's submission—whether it be an index, a detailed declaration, or a narrative— is immaterial." (internal quotations omitted)).

warrant *in camera* review.  Plaintiffs attack the FBI's deliberative process withholdings in that document, reasoning that because it was prepared after the Timberline incident, it cannot be regarded as predecisional.  In Camera Mem. at 8.  But the deliberative process privilege was asserted only over one page (RCFP-52) and portions of another page (RCFP-51) in that document; as noted above, those materials were properly withheld pursuant to the deliberative process privilege and, in any event, RCFP-52 was also withheld in full under the attorney-client privilege and Exemption 7(E), and the FBI may also properly rely on the attorney-client privilege to withhold the portions of RCFP-51 that were initially withheld only pursuant to the deliberative process privilege.  *See* pp. 18-19, *supra.*  The remaining exemptions the FBI asserted in this document are likewise well supported.  There is no basis for *in camera* review of this document or of any of the other materials the FBI has withheld.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment, deny Plaintiffs' motion for summary judgment and/or partial summary judgment, deny Plaintiffs' motion for *in camera review* and/or other appropriate relief, and dismiss the complaint with prejudice.

DATED this 20th day of May, 2016.          Respectfully submitted,

                                           BENJAMIN C. MIZER
                                           Principal Deputy Assistant Attorney General

                                           ELIZABETH J. SHAPIRO
                                           Deputy Director
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch

                                            */s/ Andrew M. Bernie*
                                           ANDREW M. BERNIE (DC BAR# 995376)
                                           Trial Attorney
                                           U.S. Department of Justice
                                           Civil Division
                                           Federal Programs Branch
                                           20 Massachusetts Avenue, N.W.
                                           Washington, D.C. 20530
                                           Telephone:  (202) 616-8488
                                           Fax:  (202) 616-8470
                                           E-mail:  andrew.m.bernie@usdoj.gov

                                           *Counsel for Defendants*