# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, *et al.*, )<br>)<br>) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Case No. 15-1392 (RJL) |
| ) | |
| FEDERAL BUREAU OF INVESTIGATION, *et al.*, )<br>) | **FILED** |
| ) | **MAR 2 0 2020** |
| Defendants. ) | Clerk, U.S. District & Bankruptcy<br>Courts for the District of Columbia |

## MEMORANDUM OPINION

(March 20, 2020) [Dkts. #48, #49]

The Reporters Committee for Freedom of the Press ("RCFP") and the Associated Press ("AP") (collectively, "plaintiffs") brought suit against the Federal Bureau of Investigation ("FBI") and the U.S. Department of Justice ("DOJ") (collectively, "defendants") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel defendants to release records concerning the FBI's alleged practice of impersonating members of the news media. After this Court adjudicated cross-motions for summary judgment in the suit and that decision was on appeal, plaintiff RCFP filed a new suit against defendants regarding new FOIA requests seeking similar but distinct records. When the first suit was remanded, I consolidated these two suits. Before the Court are Defendants' Motion for Summary Judgment [Dkt. #48] and Plaintiffs' Cross-Motion for Summary Judgment [Dkt. #49] regarding whether, under applicable FOIA exemptions, the FBI properly withheld records newly found on remand as well as records found as a result of

the new FOIA requests. On consideration of the pleadings, relevant law, and the entire record herein, the Court will GRANT defendants' motion and DENY plaintiffs' motion.

## BACKGROUND

Over the course of six years, plaintiffs have sent four FOIA requests to the FBI for records pertaining to its alleged practice of impersonating members of the news media in criminal investigations. This story begins in June 2007, when law enforcement investigated a series of anonymous bomb threats at Timberline High School near Seattle, Washington, and ultimately identified the person responsible for the bomb threats. *See* Pls.' Combined Statement of Material Facts as to Which There Is No Genuine Issue and Response to Defendants' Statement of Material Facts ("Pls.' Facts") ¶ 55 [Dkt. #49-2].[1] Years later, in October 2014, documents surfaced that showed *how* the FBI had identified the person responsible at Timberline: by posing as an AP reporter and sending a website link for a fake news article to a social media account associated with the threats. *Id.* ¶ 58. When the account owner clicked on the link, it delivered a Computer and Internet Protocol Address Verifier ("CIPAV") to the suspect's computer and allowed the FBI to identify the user. *Id.* When these documents surfaced, news organizations, lawmakers, and the public were concerned about the implications on freedom of the press that might arise when law enforcement impersonates news media. *Id.* ¶¶ 61–64.

---

[1] Unless noted otherwise, all docket references in this opinion are to Case No. 15-cv-1392.

## A. The 2014 Requests

In two separate letters on October 31, 2014, RCFP submitted two FOIA requests to the FBI:

> [A]ll records concerning the FBI's utilization of links to what are or appear to be news media articles or news media websites to install data extraction software, remote access search and surveillance tools, or the "Computer and Internet Protocol Address Verifier" (CIPAV).

Compl., Ex. B at 1 [Dkt. #1-2].

> [A]ll records concerning the FBI's guidelines and policies concerning undercover operations or activities in which a person may act as a member of the news media, including, but not limited to, the guidelines and policies relating to the criminal and national security undercover operations review committees and the Sensitive Operations Review Committee; guidelines and policies concerning the use of investigative methods targeting or affecting the news media, including, but not limited to, sensitive Title III applications; and all guidelines and policies concerning sensitive investigative matters involving the activities of the news media or relating to the status, involvement, or impact of an investigation upon the news media.

Compl., Ex. C at 1 [Dkt. #1-3].

In a letter on November 6, 2014, the AP submitted one similar FOIA request to the FBI seeking three categories of records:

> Any documents referring to the decision to create the fake AP news article in the Timberline High School case. In particular, I seek correspondence between the FBI's Seattle office and FBI headquarters about the case. I also seek a copy of the internal review carried out by the FBI and a copy of the Web link sent by the FBI to suspect in 2007.

> An accounting of the number of times, between Jan. 1, 2000 and Nov. 6, 2014, that the Federal Bureau of Investigation has impersonated media organizations or generated media-style material (including but not limited to emails, webpages or links) to deliver malicious software to suspects or anyone else caught up in an investigation.

Any documents [—] including training material, review and policy briefings [—] dealing with the creation and deployment of bogus news stories or media-style material in an investigative context.

Compl., Ex. A at 1 [Dkt. #1-1].

## B. The First Suit

After the FBI failed to comply with these requests, plaintiffs RCFP and the AP filed a suit alleging that defendants failed to comply with statutory deadlines, wrongfully withheld agency records, and failed to conduct a reasonable search. *See* Compl. ¶¶ 58–74 [Dkt. #1]. After plaintiffs filed suit, the FBI completed a two-part search that generated 267 pages of records, of which the FBI released 186 pages in full or in part and withheld 81 pages in full pursuant to FOIA Exemptions 1, 3, 5, 6, 7(C), and 7(E). *See* Decl. of David. M. Hardy ("First Hardy Decl.") ¶ 32 [Dkt. #18-1]. After two supplemental productions, the parties cross-moved for summary judgment.

On February 23, 2017, I granted summary judgment to defendants in full, *RCFP v. FBI*, 236 F. Supp. 3d 268 (D.D.C. 2017), holding that the search was adequate, *id.* at 275–76, that the FBI had properly justified its withholdings based on applicable FOIA exemptions, *id.* at 277–79, and that the FBI reasonably segregated information that may be disclosed, *id.* at 279–80.

Plaintiffs appealed this Court's ruling only as to the adequacy of the FBI's search. On December 15, 2017, our Circuit Court identified three deficiencies in the FBI's prior search efforts and reversed and remanded the case. *RCFP v. FBI*, 877 F.3d 399, 408 (D.C. Cir. 2017). In short, it concluded that the FBI Director's Office was "intimately involved"

in the agency's response to publicity surrounding the Timberline incident in 2014 and therefore should be, but was not, searched for responsive records. *Id.* at 406–07.

## C. The 2017 Requests

On December 5, 2017, while plaintiffs' appeal was pending before our Circuit, RCFP submitted another FOIA request to the FBI for six categories of records. *See* Compl., Ex. A at 1–2, *RCFP v. FBI*, No. 18-cv-345 (D.D.C. Feb. 14, 2018) [Dkt. #1-1]. The first two categories are identical to those RCFP had previously requested except that they sought records from *after* November 1, 2014, the FBI's previous cutoff date for the search:

> All records consisting of, reflecting, referencing, or discussing the FBI's utilization of links to what are or appear to be news media articles or news media websites to install data extraction software, remote access search and surveillance tools, or the "Computer and Internet Protocol Address Verifier" ("CIPAV"), since November 1, 2014.

> All records consisting of or reflecting the FBI's guidelines and policies concerning undercover operations or activities in which a person may act as a member of the news media, since November 1, 2014.

*Id.* at 1. The latter four categories were new and related to a report that the Office of the Inspector General ("OIG") for the Department of Justice released in September 2016:

> The FBI's Interim Policy Notice (PN) 0907N, adopted on or about June 7, 2016, and titled "Undercover Activities and Operations—Posing as a Member of the News Media or Documentary Film Crew" (the "Interim Policy Notice"). . . .

> The "comments" provided by the FBI to the Department of Justice Office of the Inspector General in response to a draft of the IG Report, . . .

> Any and all records consisting of, referencing, or discussing FBI efforts to inform its employees about the Interim Policy Notice.

Any and all revisions, updates, or modifications to the Interim Policy Notice
since June 8, 2016.

*Id.* at 1–2.

### D. The Second Suit

After the FBI again failed to comply with the requests, RCFP sued defendants on

February 14, 2018, alleging that the FBI and DOJ failed to comply with statutory deadlines,

improperly withheld responsive records, and failed to conduct an adequate search. Compl.

¶¶ 33–54, *RCFP v. FBI*, No. 18-cv-345 (D.D.C. Feb. 14, 2018) [Dkt. #1]. RCFP noticed

its new suit as related to the earlier one, *see* Notice of Related Case, *RCFP v. FBI*, No. 18-

cv-345 (D.D.C. Feb. 14, 2018) [Dkt. #2], and then moved to consolidate the two actions,

*see* Mot. to Consolidate Cases, *RCFP v. FBI*, No. 18-cv-345 (D.D.C. Mar. 9, 2018) [Dkt.

#11]. On February 11, 2019, I granted the consolidation motion and instructed the parties

to file all further filings in this docket. *See* 2/11/2019 Min. Order, *RCFP v. FBI*, No. 18-

345 (D.D.C.).

After our Circuit Court's remand, the FBI searched for additional records responsive

to the 2014 Requests and records responsive to the 2017 Request. *See* Defs.' Statement of

Material Facts as to Which There Is No Genuine Issue ("Defs.' Facts") ¶¶ 32–33 [Dkt. #48-

2); Pls.' Facts ¶¶ 32–33. The search generated 611 pages of records, 13 of which were

responsive to the 2014 Requests, 246 of which were responsive only to both the 2014 and

2017 Requests, and 352 of which were responsive only to the 2017 Request. Pls.' Facts

¶ 68. The FBI released 328 pages in full or in part and withheld 283 pages in full (including

201 pages withheld as duplicative) pursuant to FOIA Exemptions 1, 3, 5, 6, 7(C), and 7(E).

Defs.' Facts, Ex. L, Third Decl. of David M. Hardy ("Third Hardy Decl.") ¶¶ 5, 86 [Dkt. #48-3].

Plaintiffs and defendants now move for summary judgment in both cases. *See* Defs.' Mot. for Summ. J. ("Defs.' Mot.") [Dkt. #48-1]; Pls.' Cross-Mot. for Summ. J. ("Pls.' Cross-Mot.") [Dkt. #49-1].

## STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "FOIA cases typically and appropriately are decided on motions for summary judgment." *See Campbell v. Dep't of Justice*, 133 F. Supp. 3d 58, 63 (D.D.C. 2015) (internal quotation marks omitted). "Courts review an agency's response to a FOIA request *de novo*." *Id.*

"To prevail on summary judgment, an agency must demonstrate that it conducted a search reasonably designed to uncover responsive documents, that any materials withheld fall into a FOIA statutory exemption, and that it disclosed all reasonably segregable, nonexempt material." *Id.* at 64. "An agency withholding responsive documents from a FOIA release bears the burden of proving the applicability of claimed exemptions." *ACLU v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011). An agency usually does so by submitting an affidavit. *Id.* "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith," summary judgment is

warranted. *Id.* "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* (internal quotation marks omitted).

Additionally, for FOIA requests made after June 30, 2016, agency withholdings must meet an additional "foreseeable harm" standard codified in the FOIA Improvement Act of 2016. *See* Pub. L. No. 114–185, § 6, 130 Stat. 538, 544–45. Under this standard, an agency should withhold information that technically falls within one of FOIA's exemptions only if "the agency reasonably foresees that disclosure would harm an interest protected by" a statutory exemption in 5 U.S.C. § 552(b), or if "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A). Though our Circuit Court has not yet weighed in on this new requirement, my colleagues agree that agencies must at least "group together like records" and "explain the foreseeable harm of disclosure for each category." *See, e.g., Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018); *accord Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 99 (D.D.C. 2019); *Ctr. for Investigative Reporting v. Customs & Border Protection*, No. 18-cv-2901, 2019 WL 7372663, at *10 (D.D.C. Dec. 31, 2019); *Judicial Watch, Inc. v. Dep't of Justice*, No. 17-cv-832, 2019 WL 4644029, at *4 (D.D.C. Sept. 24, 2019).

Finally, even if parts of a document are exempt from disclosure, FOIA mandates that any "reasonably segregable portion of a record" be released. 5 U.S.C. § 552(b).

## ANALYSIS

### I. Law of the Case and Collateral Estoppel

At the outset, defendants argue that plaintiffs' claim that the FBI did not properly withhold records under applicable FOIA exemptions is precluded under both the law of the

case doctrine and collateral estoppel. Defs.' Mot. at 9–14.[2] After I granted summary judgment to defendants the first time and upheld the FBI's withholdings under Exemptions 1, 3, 5, 6, 7(C), and 7(E), plaintiffs did not seek appellate review of this Court's rulings on those withholdings. *See* Br. for Pls.-Appellants at 14, No. 17-5042 (D.C. Cir. June 26, 2017); *RCFP*, 877 F.3d at 402. Defendants seize on this fact, but unfortunately for them, it is of no moment. The applicability of FOIA exemptions is a fact-specific inquiry that depends on analyzing each individual record or category of records withheld. Here, the records at issue are too distinct from the records at issue in my previous ruling for either the law of the case doctrine or collateral estoppel to apply.

Under the law of the case doctrine, "the same issue presented a second time in the same case in the same court should lead to the same result." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) (emphasis omitted). "[A] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation . . . ." *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C. Cir. 1987).

At issue here are the agency's withholdings of two types of documents: (1) records responsive to the 2014 Requests that were found after our Circuit's remand required defendants to search the FBI Director's Office; and (2) records searched for and found in

---

[2] Defendants assert that their rationales for withholding documents under Exemptions 1, 3, 5, 6, and 7(C), as well as most of their rationales for withholding documents under Exemption 7(E), are the same as in the previous litigation. *See* Defs.' Mot. at 10–11 & n.5.

response to the 2017 Request. *See* Compl., *RCFP v. FBI*, No. 18-cv-345; Pls.' Cross-Mot. at 12. In my February 23, 2017 opinion, I did not consider the applicability of FOIA Exemptions 1, 3, 5, 6, 7(C), and 7(E) to any of these documents, to say the least. *See RCFP*, 236 F. Supp. 3d at 272–74. Even still, defendants argue that "the vast majority of withholdings in [their] supplemental production are supported by the same rationales that supported the withholdings in the earlier proceedings." Defs.' Mot. at 10–11. Although RCFP has acknowledged the similarity between the FOIA requests and the rationales for the withholding of responsive records, *see* Mot. to Consolidate at 2, *RCFP v. FBI*, No. 18-cv-345, the cases defendants cite do not stand for the proposition that law of the case applies where the agency has withheld *new* documents based on the same or similar rationales that the Court has endorsed with respect to other documents. *See Yunes v. Dep't of Justice*, 263 F. Supp. 3d 82, 85, 88 (D.D.C. 2017) (applying law of the case doctrine to not disturb court's prior decision that certain records were properly withheld when court considered withholding of one additional record); *Charles v. Office of the Armed Forces Med. Examiner*, 979 F. Supp. 2d 35, 41–42 (D.D.C. 2013) (adopting as law of the case the court's previous rulings regarding applicability of FOIA exemptions while considering the remaining issue of segregability of records). Indeed, I found no cases that stand for such a proposition. Because this Court has never held that any of the records at issue here were properly withheld, the law of the case doctrine has no application.

Defendants' collateral estoppel argument is no more meritorious. For collateral estoppel to apply, (1) "the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case"; (2) "the issue must have

been actually and necessarily determined by a court of competent jurisdiction in that prior case"; and (3) "preclusion in the second case must not work a basic unfairness to the party bound by the first determination." *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). The party invoking issue preclusion "bears the burden of establishing that the conditions for its application have been satisfied." *In re Subpoena Duces Tecum*, 439 F.3d 740, 743 (D.C. Cir. 2006).

While "[c]ourts routinely enforce issue preclusion in the FOIA context," Defs.' Mot. at 12, it does not apply under these circumstances. The key to collateral estoppel in the FOIA context is that the *documents* withheld, not the rationales for the withholdings, be the same. *See Lardner v. Dep't of Justice*, 638 F. Supp. 2d 14, 23 (D.D.C. 2009). In *Martin v. Department of Justice*, 488 F.3d 446 (D.C. Cir. 2007), our Circuit Court upheld the district court's application of collateral estoppel where the plaintiff sought disclosure of the same report for which the agency's withholding had already been litigated and decided. *Id.* at 454–55. In *Roman v. National Reconnaissance Office*, 952 F. Supp. 2d 159 (D.D.C. 2013), the district court applied collateral estoppel where the plaintiff sought to relitigate the withholding of documents that were "identical to the documents" at issue in the earlier case. *Id.* at 164–65. And in *LaRouche v. Department of Treasury*, 112 F. Supp. 2d 48 (D.D.C. 2000), the district court applied collateral estoppel where the plaintiff sought two documents that had already been litigated and held to be protected from disclosure in a separate case. *Id.* at 55–56.

Defendants attempt to rely on *National Treasury Employees Union v. IRS*, 765 F.2d 1174 (D.C. Cir. 1985), but it does not extend as far as defendants want. There, the court

applied collateral estoppel to FOIA requests for the same tax form but for successive years. *See id.* at 1175, 1177. Whereas the documents there were exactly the same, the documents here are different. "[I]f the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case." *Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 601 (1948).

A valid rationale for withholding one set of documents does not necessarily apply equally to every other set of documents. *See Elec. Frontier Found. v. Dep't of Justice*, 141 F. Supp. 3d 51, 56 (D.D.C. 2015); *Hall v. CIA*, 668 F. Supp. 2d 172, 187 (D.D.C. 2009). To justify its withholdings under FOIA exemptions, an agency "must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977). In its affidavit, the agency must "describe the documents and the justifications for nondisclosure with reasonably specific detail [and] demonstrate that the information withheld logically falls within the claimed exemption." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). Adopting defendants' position that collateral estoppel applies where the agency's rationales for withholding documents are the same, regardless of what the specific documents are, would violate our Circuit's long held requirement that agencies justify withholdings with details specific to the documents at issue. *See Mead*

*Data Cent.*, 566 F.2d at 251. Put simply, their position would endorse judicial laziness. That I cannot do.[3]

## II. Applicability of FOIA Exemptions

Under FOIA, agencies are required to produce requested information unless it falls into one of nine statutory exemptions. *See* 5 U.S.C. § 552(b); *Murphy v. Exec. Office for U.S. Attorneys*, 789 F.3d 204, 206 (D.C. Cir. 2015). When documents are withheld, the agency bears the burden of demonstrating the documents were properly withheld. *See ACLU*, 628 F.3d at 619. Agencies often produce a *Vaughn* index, *see Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), and provide information in affidavits or declarations to meet this burden. The FBI here withheld information in full and in part citing FOIA Exemptions 1, 3, 5, 6, 7(C), and 7(E). Plaintiffs challenge the applicability of many of the FBI's withholdings under Exemptions 5, 6, 7(C), and 7(E). I address each of these claimed exemptions in turn.

### a. Exemption 5

The FBI partially withheld 99 pages of material under FOIA Exemption 5, which exempts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency," 5 U.S.C. § 552(b)(5). Exemption 5 "incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant" such as "the

---

[3] Because I conclude that law of the case and collateral estoppel do not apply, I need not address plaintiffs' alternative arguments that the new "foreseeable harm" requirement Congress imposed in the FOIA Improvement Act of 2016 is an intervening change in the law that precludes applying these doctrines. *See* Pls.' Cross-Mot. at 15, 18.

deliberative process privilege." *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006). The deliberative process privilege includes "documents and other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). The deliberative process privilege serves several purposes, including "to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism" and "to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

Plaintiffs contend that defendants have failed to provide sufficient detail for the Court to determine whether the deliberative process privilege applies to six categories of withheld documents. I disagree. Two requirements are essential to the applicability of the deliberative process privilege: "the material must be predecisional and it must be deliberative." *In re Sealed Case*, 121 F.3d at 737. To be predecisional, documents must have been "generated before the adoption of an agency policy." *Coastal States Gas Corp.*, 617 F.2d at 866. To be deliberative, documents must "reflect[] the give-and-take of the consultative process." *Id.* An agency seeking to withhold information under the deliberative process privilege must provide a specific description in its *Vaughn* index of each individual document and the role it plays in the decisionmaking process. For each

document, the agency must show "(1) what deliberative process is involved, (2) the role played by the documents in issue in the course of that process, and (3) the nature of the decisionmaking authority vested in the office or person issuing the disputed document[s], and the positions in the chain of command of the parties to the documents." *Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 243 F. Supp. 3d 155, 168 (D.D.C. 2017) (first quoting *Senate of P.R. v. Dep't of Justice*, 823 F.2d 574, 585–86 (D.C. Cir. 1987); then quoting *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982)).

First, the FBI withheld an email chain providing recommended revisions to a draft letter to the editor of the *New York Times*. Third Hardy Decl. ¶ 50. According to David M. Hardy, the Section Chief of the Record/Information Dissemination Section of the FBI's Information Management Division, these emails "precede[d] former FBI Director Comey's letter" and "contain detailed discussions and proposals leading to the decision about how the FBI would respond" to inquiries concerning the FBI's Timberline Investigation. *Id.* ¶ 51. The FBI has sufficiently "pinpoint[ed] an agency decision or policy to which the document[s] contributed," *Senate of P.R.*, 823 F.2d at 585: the decision of how to respond to public inquiries about the FBI's impersonation of news media. Plaintiff counters that deliberations "about how to present an already decided policy to the public" cannot be protected by the deliberative process privilege. Pls.' Cross-Mot. at 25–26. But multiple members of this court, including myself, have disagreed: if documents are "generated as part of a continuous process of decision making" such as "how to respond to on-going inquiries" from the press or Congress, they are predecisional and deliberative. *Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 736 F. Supp. 2d 202, 208 (D.D.C. 2010); *see also*

*Judicial Watch, Inc. v. Dep't of Treasury*, 796 F. Supp. 2d 13, 31 (D.D.C. 2011); *Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 880 F. Supp. 2d 105, 111–12 (D.D.C. 2012). Mr. Hardy further explains that disclosing email discussions like this one would cause agency personnel to "be less candid and more circumspect in expressing their thoughts, which would impede the fulsome discussion of issues necessary to reach a well-reasoned decision." Third Hardy Decl. ¶ 48. This foreseeable harm is among those Exemption 5 seeks to prevent. *See Machado Amadis v. Dep't of Justice*, 388 F. Supp. 3d 1, 20 (D.D.C. 2019). I therefore conclude that this email chain was properly withheld.

Second, the FBI withheld drafts of the Office of the Inspector General's report regarding the FBI's impersonation of a journalist in a criminal investigation. Third Hardy Decl. ¶ 50. Mr. Hardy stated that these documents "precede[d] the final [OIG] report" and "reflect advice and information that FBI and OIG shared" regarding the report. *Id.* ¶ 52. While true that drafts are not automatically exempt, *see Judicial Watch, Inc. v. U.S. Postal Service*, 297 F. Supp. 2d 252, 260 (D.D.C. 2004), drafts "are commonly found exempt under the deliberative process exemption" because they precede the final decision. *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 303 (D.D.C. 2007). According to Deborah Waller, OIG's Government Information Specialist and FOIA Officer, disclosure of these drafts would be harmful because they would "reveal the thought and decision-making processes of the OIG and may not reflect the agency's final decisions." Decl. of Deborah M. Waller ("Waller Decl.") ¶¶ 14, 16 [Dkt. #48-4]. I conclude that these drafts were properly withheld.

Third, the FBI withheld filled-in copies of blank, fillable forms that FBI personnel used to submit comments on the OIG draft report. Third Hardy Decl. ¶ 50. Like the draft reports themselves, these comment forms "precede[d] the final [OIG] report." *Id.* ¶ 52. These documents contain agency personnel's "recommendations, opinions, and proposed language" regarding the OIG's draft report on the Timberline incident. Fourth Decl. of David M. Hardy ("Fourth Hardy Decl.") ¶ 17 [Dkt. #51-1]; *see also* Third Hardy Decl. ¶ 52. Although these forms contain "comments as to the factual accuracy" of the report, *see* Pls.' Reply in Opp. to Defs.' Mot. for Summ. J. ("Pls.' Reply") at 10 [Dkt. #53], sometimes even "purely factual material may so expose the deliberative process" that it falls under Exemption 5. *Mead Data Cent.*, 566 F.2d at 256. The Court is satisfied that any factual comments are so intrinsically linked to the FBI personnel's recommendations and opinions regarding the OIG draft report that disclosure could expose the deliberative process. *Id.* As to what harm the agency foresees, Mr. Hardy predicts that "FBI employees would hesitate to offer their candid and conscientious opinions to superiors or coworkers if they knew their opinions of the moment might be made a matter of public record at some future date." Third Hardy Decl. ¶ 49; *see also* Fourth Hardy Decl. ¶ 18 ("Disclosing any of the information" withheld would cause "employees [to] come to fear their unrefined opinions could become subject to public disclosure through the FOIA."). I therefore conclude that these comment forms were properly withheld.

Fourth, the FBI withheld drafts of PowerPoint slides concerning undercover operations. Third Hardy Decl. ¶ 50. According to Mr. Hardy, these drafts "precede[d] a potential final PowerPoint presentation regarding FBI's policies and procedures" and

"reflect preliminary proposals and recommendations about how to ultimately instruct FBI personnel about conducting undercover operations." *Id.* ¶ 53. As previously noted, drafts "are commonly found exempt under the deliberative process exemption" because they precede the final decision. *People for the Am. Way Found.*, 503 F. Supp. 2d at 303. Like drafts of the OIG report, the agency reasonably foresees harm, as disclosure would "reveal the thought and decision-making processes of the OIG and may not reflect the agency's final decisions." Waller Decl. ¶¶ 14, 16. I conclude these drafts were also properly withheld.

Fifth, the FBI withheld an OIG memorandum discussing preliminary conclusions and recommendations regarding the Timberline investigation. Third Hardy Decl. ¶ 50. According to Ms. Waller, the memorandum accompanied the OIG's final report but contained references to predecisional communications between the Inspector General and the FBI that preceded the final report. Waller Decl. ¶ 19. These communications played a part in the process by which OIG reached its final conclusions regarding the FBI's impersonation of a journalist. *Id.* Contrary to plaintiffs' suggestion that the withheld discussion contains a "final opinion" of the agency, *see* Pls.' Reply at 11, Ms. Waller explained that the withheld information referenced predecisional discussions and commentary that may *not* have been ultimately adopted by the agency and would reveal decisionmaking processes. *See* Waller Decl. ¶¶ 19–20. This foreseeable harm is one of the harms the deliberative process privilege is designed to prevent. *See Coastal States Gas Corp.*, 617 F.2d at 866. I conclude that this information was properly withheld.

Sixth, the FBI withheld emails between FBI attorneys and other FBI personnel "discussing matters pertaining to the application of an investigative technique," implementation of Policy Notice 0907N regarding certain undercover investigations, and a DOJ OIG report "concerning information discussing the FBI's handling of the Timberline School Investigation." Third Hardy Decl. ¶ 50. According to Mr. Hardy, these emails "precede[d] the FBI's Policy Notice 0907N" and "reflect[] internal advice and recommendations" regarding policy changes in the approval process for undercover investigations involving impersonation of the news media. *Id.* ¶ 54. He anticipates that disclosure of such communications would cause FBI employees and attorneys to "hesitate to offer their candid and conscientious opinions to superiors or coworkers," thereby "degrad[ing] the quality of agency decisions by depriving the decision-makers of fully-explored options developed from robust debate." *Id.* ¶ 49. This harm is foreseeable and one that Exemption 5 was designed to protect against. *See Cause of Action Inst. v. Dep't of Justice*, 330 F. Supp. 3d 336, 355 (D.D.C. 2018). I thus conclude these emails were properly withheld.

Withholding these six categories of documents readily satisfies the purposes underlying Exemption 5 of FOIA. To say the least, agency personnel should not be "forced to operate in a fishbowl" where their comments and contributions to an agency decisionmaking process may become part of discovery in a case at any time. *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993). I would, however, join the chorus of members of this court in rejecting the Government's position, *see* Defs.' Opp. to Pls.' Mot. for Summ. J. at 7–9 [Dkt. #51], that general assertions of harm to the deliberative process

are sufficient to satisfy the "heightened standard" of the FOIA Improvement Act's "foreseeable harm" requirement, *see, e.g.*, *Ctr. for Investigative Reporting*, 2019 WL 7372663, at \*9. They are not. The Government would be wise in the future to heed such rulings.

### b. Exemption 6 and 7(C)

The FBI also withheld names and/or identifying information of various persons from 196 pages of records under FOIA Exemptions 6 and 7(C). *See* Defs.' Facts, Ex. K, Index at 1–26 [Dkt. #48-3]. Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Similarly, Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes," the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C). These exemptions reflect a balance between "the privacy interests that would be compromised by disclosure" and "the public interest in release of the requested information." *Sussman v. Dep't of Justice*, 494 F.3d 1106, 1115 (D.C. Cir. 2007).

The FBI has asserted Exemptions 6 and 7(C) for records containing names and/or identifying information for (1) FBI special agents and support personnel, (2) non-FBI federal government personnel, (3) third parties of investigative interest, (4) third parties merely mentioned, and (5) local law enforcement personnel. Plaintiffs do not contest the withholding of names and identifying information of third parties, *i.e.*, the third and fourth categories. Pls.' Cross-Mot. at 31 & n.6. Plaintiffs instead "contest[] the reflexive

withholding" of FBI personnel, federal government employees outside the FBI, and local law enforcement. Pls.' Reply at 15; *see also* Pls.' Cross-Mot. at 29–33.

First, the FBI withheld names and identifying information for FBI special agents and support personnel from 181 pages of records. Third Hardy Decl. ¶ 60. Generally, law enforcement and support personnel have an "extremely strong privacy interest" in not having their identifying information disclosed in connection with any particular investigative matter. *Brown v. FBI*, 873 F. Supp. 2d 388, 404 (D.D.C. 2012). This is because disclosure could often "subject them to annoyance or harassment in either their official or private lives." *Lesar v. Dep't of Justice*, 636 F.2d 472, 487 (D.C. Cir. 1980). Mr. Hardy explained that publicity regarding which agents are working on any particular investigation "may seriously prejudice their effectiveness" and may result in "unnecessary, unofficial questioning as to their assistance," including by individuals who "may carry a grudge" and thus "seek revenge" on the agents and staff involved. Third Hardy Decl. ¶ 60. Additionally, FBI employees possess security clearances that give them access to classified material and systems; identifying certain FBI employees would subject them to attention, targeting, and/or exploitation by "criminal elements, terrorists, and foreign intelligence services." *Id.* ¶ 63. On the other side, plaintiffs have shown little public interest in disclosing the names or identifying information of FBI personnel. Knowing the specific names and contact information of personnel will do little, to say the least, to "inform the public about the FBI's use of th[e] tactic" of impersonating members of the new media, Pls.' Cross-Mot. at 33. Mr. Hardy's justifications for withholding names and identifying information for FBI personnel, *see* Third Hardy Decl. ¶¶ 60, 63, readily satisfy the

"foreseeable harm" requirement. *See Banks v. Dep't of Justice*, 813 F. Supp. 2d 132, 144 (D.D.C. 2011). I therefore conclude that names and identifying information of FBI personnel were properly withheld.

Next, the FBI withheld the name of a government employee outside the FBI in one record. Third Hardy Decl. ¶ 66. Mr. Hardy explained that disclosure of this individual's identity could subject him or her "to unauthorized inquiry and harassment and would constitute a clearly unwarranted invasion of his/her personal privacy." *Id.* Finally, the FBI withheld names and identifying information for local law enforcement personnel who aided the FBI in its investigation from two pages of records. *Id.* ¶ 69. Mr. Hardy explained that publicity about the identities of these law enforcement personnel would subject them to "unnecessary, unwarranted harassment" and make them targets for compromise. *Id.* The same concerns about publicizing the names of FBI personnel apply to the names of non-FBI federal government and local law enforcement personnel. *See Schoenman v. FBI*, 763 F. Supp. 2d 173, 198–99 (D.D.C. 2011). Plaintiffs have failed to show how the release of any of these names or identifying information will help the public determine whether FBI officials engaged in illegal or unconstitutional activity by impersonating journalists. *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991). Like information about FBI personnel, the justifications for withholding information about non-FBI and local law enforcement personnel, *see* Third Hardy Decl. ¶¶ 66, 69, readily satisfy the "foreseeable harm" requirement. *See Banks*, 813 F. Supp. 2d at 144. I similarly conclude that such information is properly withheld under Exemptions 6 and 7(C).

22

### c. Exemption 7(E)

The FBI finally withheld eight categories of records under FOIA Exemption 7(E), which exempts from disclosure "records or information compiled for law enforcement purposes" where their production "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law," 5 U.S.C. § 552(b)(7)(E). Exemption 7(E) protects information that would "train potential violators to evade the law," "instruct them how to break the law," or "increase the risks that a law will be violated or that past violators will escape legal consequences." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009) (emphasis omitted).

The FBI asserted Exemption 7(E) with respect to 1) operational directives; 2) undercover operations; 3) the identity and/or location of FBI or joint units, squads, or divisions; 4) internal FBI secure fax numbers and phone numbers; 5) sensitive investigative techniques and procedures; 6) targets of pen registers or trap and trace devices; 7) collection and analysis of information; and 8) sensitive file numbers and/or subfile names. *See* Third Hardy Decl. ¶¶ 73–81. Plaintiffs challenge only defendants' withholding of the first, second, and seventh categories: FBI operational directives (including internal guidelines and policies), undercover operations, and collection and analysis of information. *See* Pls.' Cross-Mot. at 35 & n.8.

As a preliminary matter, to withhold documents under Exemption 7(E), the agency must first show "that the records were compiled for a law enforcement purpose." *Kay v.*

*FCC*, 976 F. Supp. 23, 36 (D.D.C. 1997). "Agencies classified as law enforcement agencies receive a special deference in their claims of law enforcement purpose." *Pinson v. Dep't of Justice*, 313 F. Supp. 3d 88, 113 (D.D.C. 2018). FBI investigatory records are law enforcement records when the investigation is "related to the enforcement of federal laws." *Jefferson v. Dep't of Justice*, 284 F.3d 172, 177 (D.C. Cir. 2002). I easily conclude that the records the FBI withheld here were compiled for a law enforcement purpose, as impersonating journalists is a law enforcement technique. Whether the withheld records fall within the specific parameters of Exemption 7(E), however, is another issue.

First, the FBI withheld information relating to operational directives in 32 pages of responsive records. *See* Third Hardy Decl. ¶ 73; Index at 1–23. According to Mr. Hardy, this material "comprises operational directives that provide information and instruct FBI employees on the proper use of certain sensitive non-public FBI procedures, techniques, and guidance for conducting investigations." Third Hardy Decl. ¶ 73. Such information could "provide a 'roadmap' or 'guidance' to those looking to circumvent the law," *Am. Immigration Lawyers Ass'n v. Dep't of Homeland Sec.*, 852 F. Supp. 2d 66, 79 (D.D.C. 2012), and is therefore at the heart of the Exemption 7(E) protection. Plaintiffs respond that the FBI's impersonation of journalists in the Timberline investigation and other operations is public knowledge and that the FBI cannot shield information under Exemption 7(E) regarding "use of a technique that is known to the public." Pls.' Cross-Mot. at 36–37. However, the fact that a law enforcement technique is generally known, *RCFP v. FBI*, 369 F. Supp. 3d 212, 223 (D.D.C. 2019), does not mean its specific procedures or applications are known or that disclosing them would not risk compromising

specific investigations. Exemption 7(E) protects "confidential details of . . . program[s]" if only their "general contours [a]re publicly known." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1112 (D.C. Cir. 2007). An agency may still properly withhold portions of documents that "relate to law enforcement procedures not known to the public," including ordinary manuals that "include confidential details of law enforcement programs." *Jaffe v. CIA*, 573 F. Supp. 377, 387 (D.D.C. 1983). Mr. Hardy foresees that "[r]eleasing such information would not only provide sensitive, unknown investigative techniques, [but] it would also reveal sensitive unknown uses of these specific techniques and procedures" that would allow "criminals [to] predict how and when the FBI will respond to certain suspicious/criminal activities, and the investigative techniques the FBI is mostly likely to employ in those situations." Third Hardy Decl. ¶ 73. I agree and therefore conclude this information was properly withheld.

The FBI also withheld information about undercover operations from 10 pages of responsive records. *See* Third Hardy Decl. ¶ 74; Index at 1–23. According to Mr. Hardy, the withheld information consists of "non-public details relat[ing] specifically to the FBI's Seattle Timberline Investigation and FBI undercover operations in general." Third Hardy Decl. ¶ 74. Transparency about specific details of FBI policy could help criminals to discern the ruse and avoid detection in their criminal enterprises. *See Skinner v. Dep't of Justice*, 744 F. Supp. 2d 185, 215 (D.D.C. 2010). The Court is satisfied that the FBI's procedures relate to techniques and methods for surreptitiously investigating potential criminals and engaging in undercover operations. Further, Mr. Hardy explains that "if specific investigative techniques or procedures are made public, the very criminals and

terrorist groups who seek harm to U.S. interests can use the information to their advantage, learn FBI tactics in gathering information, and develop countermeasures to avoid detection." Third Hardy Decl. ¶ 72. He further describes how, "[i]f the FBI were to disclose these non-public details about how it conducts undercover operations and release details of specific techniques used during its undercover operations, it . . . would jeopardize future use of undercover operations by the FBI in similar cases or under similar circumstances." Fourth Hardy Decl. ¶ 14. I conclude this information was properly withheld.

Finally, the FBI withheld material regarding the FBI's collection and analysis of information on one page of responsive records. Third Hardy Decl. ¶ 79. This information concerned an FBI undercover operation and discussed the FBI's sources and methods of collecting and analyzing information. *Id.* "Knowing what information is collected, how it is collected, and more importantly, when it is *not* collected, is information that law enforcement might reasonably expect to lead would-be offenders to evade detection." *Soghoian v. Dep't of Justice*, 885 F. Supp. 2d 62, 75 (D.D.C. 2012). It is true that, typically, "the agency must at least provide *some* explanation of what procedures are involved and how they would be disclosed." *Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 746 F.3d 1082, 1102 (D.C. Cir. 2014). Here, Mr. Hardy's statement that this information relates to the FBI's methods of collecting and analyzing information is sufficient, as any further information would disclose the very sources and methods the FBI seeks to keep confidential.

Under Exemption 7(E), the agency finally must "establish that releasing the withheld materials would risk circumvention of the law." *PHE, Inc. v. Dep't of Justice*, 983 F.2d 248, 250 (D.C. Cir. 1993). The FBI has clearly done so. Here, "[t]he information withheld under Exemption 7(E) is extremely descriptive, detailed and specific in nature" and "comprises a fuller picture of the current uses of FBI techniques not known to the public." Fourth Hardy Decl. ¶ 15. While any one piece of information might not compromise the FBI's techniques or procedures, "pieces of information can be assembled—in mosaic fashion—to provide a framework to determine how, when, under which circumstances, certain te[ch]niques are employed." *Id.* ¶ 16. Disclosing this information to the public, including to criminals, would allow criminals to "develop countermeasures to avoid detection" and "to nullify the effectiveness of the techniques." *Id.* This Court is thus satisfied that the withheld information falls properly under Exemption 7(E).

### III. Segregability of Records

Finally, plaintiffs contest the FBI's segregation of responsive records. Under FOIA, even if an agency establishes that information in a document is exempt from disclosure, an agency must "disclose all reasonably segregable, nonexempt portions of the requested record(s)." *Assassination Archives & Res. Ctr. v. CIA*, 334 F.3d 55, 58 (D.C. Cir. 2003); *see also* 5 U.S.C. § 552(b). Plaintiffs argue that the FBI has not adequately explained why it could not reasonably segregate and disclose some material in 82 pages the FBI withheld in full. Pls.' Cross-Mot. at 21. The FBI released 328 pages in full or in part and withheld 283 pages in full (including 201 pages withheld as duplicative). Third Hardy Decl. ¶¶ 5,

86. Mr. Hardy declared that "each responsive page was individually examined to identify non-exempt information that could be reasonably segregated from exempt information for release." *Id.* ¶ 85. He further stated that "[e]very effort was made to provide Plaintiffs with all material in the public domain and with all reasonably segregable non-exempt information in the responsive records," *id.* ¶ 27, and that "the only information withheld by the FBI consists of information that would trigger reasonably foreseeable harm to one or more interests protected by the cited FOIA exemptions," *id.* ¶ 85. "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117. Upon review of the FBI's declarations and *Vaughn* index, I conclude that the FBI has fulfilled its duty to reasonably segregate the records.

## CONCLUSION

For all the foregoing reasons, defendants' Motion for Summary Judgment is GRANTED and plaintiffs' Cross-Motion for Summary Judgment is DENIED. A separate Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge