## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS**, *et al.*, ) ) ) | |
| **Plaintiffs**, ) ) | |
| v. ) ) | **Civil Case No. 15-1392 (RJL)** **(consolidated with No. 18-345)** |
| **FEDERAL BUREAU OF INVESTIGATION**, *et al.*, ) ) ) | |
| **Defendants**. ) | |

## MEMORANDUM OPINION
(June 3, 2022) [Dkts. #63, #64]

Plaintiffs Reporters Committee for Freedom of the Press ("RCFP") and the Associated Press ("AP") (collectively, "plaintiffs") sued the Federal Bureau of Investigation ("FBI") and the U.S. Department of Justice ("DOJ") (collectively, "defendants" or "the Government") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel defendants to release records concerning the FBI's alleged practice of impersonating members of the news media. After this Court adjudicated cross-motions for summary judgment in that suit and while the decision granting summary judgment in favor of defendants was on appeal, RCFP filed a second suit against defendants regarding additional FOIA requests for similar but distinct records. Our Circuit Court remanded the first suit, and I consolidated the two actions. I again granted summary judgment in favor of defendants. Plaintiffs appealed, and our Circuit Court affirmed in part, reversed in part, and dismissed in part. Only a narrow issue as to one document remains: whether the

Government can demonstrate that it properly withheld under Exemption 5—the deliberative-process privilege—a draft of the September 2016 Office of Inspector General ("OIG") Report because it reasonably foresees that its disclosure would harm its internal deliberations. For the third time, the parties have cross-moved for summary judgment. *See* Defs.' Mot. for Summ. J. ("Defs.' MSJ") [Dkt. 63]; Pls.' Cross-Mot. for Summ. J. ("Pls.' MSJ") [Dkt. 64].

Upon consideration of the pleadings, relevant law, and the entire record herein, the defendants' motion is GRANTED and the plaintiffs' motion is DENIED.

### FACTUAL AND PROCEDURAL BACKGROUND

Because this is the third time the parties' dispute is before this Court, the background of this case already has been recounted and I need not repeat the facts at length. *See Reporters Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 236 F. Supp. 3d 268 (D.D.C. 2017); *Reporters Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, __ F. Supp. 3d __, 2020 WL 1324397 (D.D.C. Mar. 20, 2020).

Briefly, in June 2007, law enforcement investigated a series of anonymous bomb threats at Timberline High School near Seattle, Washington and ultimately identified the person responsible for the threats. *See Reporters Comm.*, 2020 WL 1324397 at *1. After documents surfaced in October 2014 showing that the FBI had identified the person responsible by posing as an AP reporter and sending a website link for a fake news article to a social media account associated with the threats, plaintiffs sent four FOIA requests to the FBI over the course of six years seeking records related to the FBI's alleged practice of impersonating members of the news media in criminal investigations. *Id.*

After the FBI failed to comply with the first set of requests, RCFP and AP filed suit. *Id.* at *2. The FBI then completed a search and released (and withheld) various records. *Id.* I granted summary judgment to defendants. *Id.*; *see also Reporters Comm.*, 236 F. Supp. 3d at 280. Plaintiffs appealed only as to the adequacy of the FBI's search. *Reporters Comm.*, 2020 WL 1324397 at *2. Our Circuit Court reversed and remanded, identifying three deficiencies in the FBI's search. *Id.*; *see also Reporters Comm. for Freedom of the Press v. Fed. Bureau of Investigation ("RCFP I")*, 877 F.3d 399 (D.C. Cir. 2017).

The FBI again failed to comply with a second set of requests, prompting the second suit. *Reporters Comm.*, 2020 WL 1324397 at *3. On remand, the FBI conducted an additional search on the first requests and a search on the second requests. *Id.* I again granted summary judgment in favor of defendants. *Id.* at *12. Plaintiffs appealed, challenging this Court's determinations that six categories of documents "were exempt from release because they were protected by the deliberative process privilege" and that "release of those documents would foreseeably harm the interests protected by the privilege." *Reporters Comm. for Freedom of the Press v. Fed. Bureau of Investigation ("RCFP II")*, 3 F.4th 350, 361 (D.C. Cir. 2021).

Our Circuit Court affirmed in part, reversed in part, and dismissed in part. *Id.* at 372. It affirmed that "[t]he government properly withheld the emails in which FBI leadership deliberated about appropriate responses to media and legislative pressure to alter the FBI's undercover tactics, as well as internal conversations about the implications of changing their undercover practices going forward." *Id.* at 357. "But," the Circuit held, "the government did not satisfy its burden to show" that the disclosure of certain

3

documents—namely, a draft OIG report, Factual Accuracy Comments, and draft PowerPoint slides—"would cause foreseeable harm." *Id.*; *see also id.* at 372. Since our Circuit Court's decision, defendants voluntarily released the Factual Accuracy Comments and draft PowerPoint slides. *See* Defs.' MSJ at 8. Defendants also released certain portions of the draft OIG report that were quoted in the Factual Accuracy Comments. *See* Defs.' Reply-Response in Support of Mot. for Summ. J. and in Opposition to Pls.' Mot. for Summ. J. ("Defs.' Reply-Response") [Dkt. 66] at 1. Thus, only portions of the draft OIG report remain at issue. The parties' cross-motions for summary judgment on that question are now before this Court.

## STANDARD OF REVIEW

"Courts review an agency's response to a FOIA request *de novo* … and FOIA cases typically and appropriately are decided on motions for summary judgment." *Campbell v. U.S. Dep't of Justice*, 133 F. Supp. 3d 58, 63 (D.D.C. 2015) (internal quotation marks omitted). A moving party is entitled to summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ANALYSIS

"To carry its burden at summary judgment, the government must demonstrate that (A) the materials at issue are covered by the deliberative process privilege, and (B) it is reasonably foreseeable that release of those materials would cause harm to an interest protected by that privilege." *RCFP II*, 3 F.4th at 361 (citing *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020); 5 U.S.C. § 552(a)(8)(A)(i)(I)). Here, the first

prong has already been met—our Circuit Court agreed that the draft report falls within the deliberative-process privilege—so only the second is relevant to this Court's inquiry on remand. "In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *RCFP II*, 3 F.4th at 369–70 (quoting *Machado Amadis*, 971 F.3d at 371). "[W]hat is needed is a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *RCFP II*, 3 F.4th at 370.

On appeal, our Circuit Court determined on the prior record that the Government had not made this showing to justify its withholding of the draft OIG report. It contrasted the prior record in this case with the "thoroughgoing and detailed pages of explanation as to the importance and deliberative value of the specific information in those records in the particular decisional context in which they arose" in *Machado Amadis*. *RCFP II*, 3 F.4th at 371. There, the Office of Information Policy ("OIP") "reasonably foresaw that disclosure [of fields for recommendations, discussion, and search notes in forms used to adjudicate FOIA appeals] would harm an interest protected by the deliberative-process privilege." *Machado Amadis*, 971 F.3d at 371. In this case, however, our Circuit Court held that the Government's "showing of harm … f[ell] short" by "fail[ing] to 'specifically focus[]' its foreseeable harm demonstration 'on the information at issue in [the documents] under review.'" *RCFP II*, 3 F.4th at 369–70 (quoting *Machado Amadis*, 971 F.3d at 371).

The parties dispute whether the Government's supplemental declarations accompanying its summary-judgment motion correct the deficiencies identified by our Circuit Court on the prior record.  In the Government's view, supplemental declarations from DOJ's OIG and the FBI "thoroughly detail the harm to agency decisionmaking, factfinding, and credibility from release of OIG's preliminary assessments in its draft reports" and "describe the reasonably foreseeable harm from disclosure by linking the asserted harm to the withheld information in concrete terms."  Defs.' MSJ at 1.  Plaintiffs counter that the Government "ha[s] not—and indeed cannot—justify [its] continued withholding of the Draft Report" because it "cannot demonstrate, in a 'focused and concrete' way, that harm would flow from disclosure of the Draft Report."  Pls.' MSJ at 2–3.  Unfortunately for plaintiffs, I agree with defendants that the Government, through its supplemental declarations, has satisfied the required foreseeable harm showing.[1]  How so?

The supplemental declarations' descriptions detail the context of the agency action at issue by outlining the process through which OIG conducts a review of a DOJ component and explaining how that review led to the draft (and, ultimately, the final) report on the FBI's practices and operations.  And the Government's declarations demonstrate why

---

[1] At the threshold, plaintiffs argue that the Government waived its ability to withhold the draft report in full because portions of the draft "already have been disclosed and exist in the public domain," or at least to withhold those portions of the draft report that were released in the Factual Accuracy Comments. Pls.' MSJ at 5–6.  Because the Government has since released the specified portions that previously were released in other forms, the withholding of those portions is no longer at issue.  Moreover, disclosure of portions of a document does not require disclosure of its remainder. *See Mehl v. U.S. Envtl. Prot. Agency*, 797 F. Supp. 43, 47 (D.D.C. 1992) ("[A]n agency may release non-exempt portions of a document while withholding exempt portions.  It follows that an agency voluntarily may disclose a portion of an exempt document without waiving the exemption for the entire document."); *see also Rockwell Intern. Corp. v. U.S. Dep't of Justice*, 235 F.3d 598, 605 (D.C. Cir. 2001) ("Nor do we see how quoting portions of some attachments is inconsistent with a desire to keep the rest secret[.]").  Therefore, the Government has not waived the deliberative-process privilege over any portion of the draft report.

disclosure of the draft resulting from that process would impede the agency's deliberations during that same process in the future.  These are hardly the "cookie-cutter formulations" that our Circuit Court rejected previously.  *Cf. RCFP II*, 3 F.4th at 371.

To start, Deborah M. Waller—the Supervisory Government Information Specialist and the Freedom of Information Act Officer for DOJ's OIG—offered a detailed explanation of the "particular type of material at issue" in the agency action's "specific context."  *See RCFP II*, 3 F.4th at 370.  She overviewed the contents of the final report and the process OIG undertook in conducting its review, including proposing factual findings and recommendations for review internally and by the affected component.  Decl. of Deborah M. Waller, Defs.' MSJ ("Waller Decl.") [Dkt. 63-3] at ¶¶ 9–10.  "This review process," Waller explained, "provides … an opportunity to review the draft report for factual accuracy, for sensitivity, and to raise questions or concerns about the proposed recommendations before the final report is issued."  *Id.* at ¶ 10.  Feedback "greatly benefits" the process of preparing the report.  *Id.*  And "[e]ach decision to include or exclude certain factual information and each decision about whether factual information provides a sufficient basis to make a particular finding or recommendation for improvement in DOJ's operations or programs form an integral part of the OIG's deliberative process in the preparation of its reports."  *Id.* at ¶ 12.

Michael G. Seidel, the Section Chief of the Record/Information Dissemination Section, Information Management Division of the FBI, provides additional context for the draft report at issue here.  He explained that the final report is the result of an "extensive review of documents," follows from interviews of various law enforcement officers and

attorneys, includes information about DOJ and FBI policies at the time of the Timberline

investigation and the OIG investigation, and discusses OIG findings and recommendations.

Decl. of Michael G. Seidel, Defs.' MSJ ("Seidel Decl.") [Dkt. 63-4] at ¶ 20.  To prepare

for the final report, OIG shared a draft report with the FBI that included "preliminary

findings and recommendations" so that the parties could "have open and frank discussions

about sensitive aspects of the investigation, findings and proposed recommendations as

well as to confirm or correct facts prior to the publication of the final report."  *Id.* at ¶ 21.

"This process," he explained, "ensures the integrity of OIG's investigations and report prior

to its publication as well as an accurate depiction of the FBI's practices and activities in

OIG's final report."  *Id.*  Based on these descriptions, the Waller and the Seidel

supplemental declarations sufficiently "explain the particular sensitivity of the types of

information at issue [and] the role that they play in the relevant agency decisional

processes."  *RCFP II*, 3 F.4th at 372.

    Against this backdrop, the declarants offered a "focused and concrete

demonstration" of the foreseeable harms that would result from disclosure of the draft

report—namely, why disclosure "will … actually impede th[e] same agency deliberations

going forward."  *RCFP II*, 3 F.4th at 370.  Ms. Waller explains that the draft's release

"would severely hamper the efficient day-to-day workings of the OIG in reviewing"

agency operations, making factual findings, and offering recommendations for those

operations.  Waller Decl. at ¶ 15. This is so because report drafters "would be much more

circumspect in including their frank and unfiltered views regarding the proposed factual

findings and recommendations in draft reports," and "would likely keep their drafts in a

close hold and refrain from sharing them with others … at earlier stages in the drafting process." *Id.*; *see also* Seidel Decl. at ¶ 25 (describing "negative[] impact" on "OIG's future collaboration with the FBI … for fear of public release," which "would prevent frank discussion among both agencies").

Specifically, this "hamper[ing]" "would deprive the OIG and the affected DOJ component[s] of the benefits of the candid earlier-stage advice and feedback from senior OIG personnel and from DOJ components … when such advice and feedback would be most beneficial." Waller Decl. at ¶ 16. "The chilling of frank and unfiltered exchanges of views … would seriously impair the OIG's process for preparing and finalizing such reports," including making "appropriate factual findings." *Id.* And disclosure "would effectively communicate to FBI employees the communication between OIG and FBI could be released to the public in non-final form and with total disregard for their factual accuracy." Seidel Decl. at ¶ 24. In short, Ms. Waller explains, the accuracy and the appropriateness of OIG's review and future reports would suffer. *See* Waller Decl. at ¶ 17 ("[T]he OIG would lose this critical element of its process that seeks to ensure that its final reports are factually accurate and that they contain appropriate recommendations" if it did not have "the ability to engage in such full and forthright internal discussions."). Further, the release of draft reports "would reasonably cause confusion or misunderstanding about the OIG's final statement on the FBI criminal investigation and underlying policies it reviewed," which would "harm the OIG's credibility." *Id.* at ¶ 18; *see* Seidel Decl. at ¶ 23.

The Government therefore has articulated a "link between the specified harm and the specific information contained in the material withheld" by explaining that "chilling

candid discussion among" and between OIG and FBI "would impair the internal discussions 'necessary for efficient and proper'" fact-finding and review. *See RCFP II*, 3 F.4th at 371 (quoting *Machado Amadis*, 971 F.3d at 371).  Considering the withholding of similar documents in the face of this type of harm, colleagues of mine have reached the same conclusion. *See, e.g.*, *Am. Civil Liberties Union v. Cent. Intelligence Agency*, 2022 WL 306360, at *9 (D.D.C. Feb. 2, 2022) (finding that the agency "demonstrated that harm is reasonably foreseeable" where "disclosure would 'discourage' employees 'from providing particularly useful knowledge, perspectives, and opinions and prevent the [a]gency from benefitting from their skill in" future similar processes); *Judicial Watch, Inc. v. U.S. Dep't of State*, 557 F. Supp. 3d 52, 62 (D.D.C. 2021) (Government demonstrated foreseeable harm where declarant argued that disclosure of a draft issue paper would "lead[] officials to 'believe that every edit or comment they propose in a draft document may be released to the public, thus curbing the candid exchange of ideas between Department officials and curtailing creativity in the compilation and explanation of Department policy'"); *Leopold v. U.S. Dep't of Justice*, 2021 WL 3128866, at *4 (D.D.C. July 23, 2021) (agreeing with the Government that release of intra-agency discussions and drafts "would dampen the free exchange of ideas within the agency," which "would ultimately damage the intra-agency decisionmaking process and the public perception of the department").

In sum, the declarations' demonstration of foreseeable harm is sufficient. *See Machado Amadis*, 971 F.3d at 371 ("OIP's affidavit adequately explained that full disclosure of the [relevant forms] would discourage line attorneys from 'candidly

discuss[ing] their ideas, strategies, and recommendations,' thus impairing 'the forthright internal discussions necessary for efficient and proper adjudication of administrative appeals.'"). Far from "wholly generalized and conclusory" assertions of harm that merely "mouth the generic rationale for the deliberative process itself," the declarations offer an account of "the precise damage to the relevant agency operations"—chilling of internal discussion during OIG investigations and preparation of reports concerning factual findings and recommendations about a component agency's practices—"that would result from [the report's] release." *RCFP II*, 3 F.4th at 370–71 (citing *Machado Amadis*, 971 F.3d at 371). This foreseeable damage to the quality of OIG's investigations by chilling internal discussion in OIG and between OIG and FBI is precisely the harm the deliberative-process privilege seeks to prevent. *See Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975). Defendants have demonstrated sufficiently that disclosure of the withheld portions of the draft OIG report would adversely impair OIG and FBI internal deliberations.

## CONCLUSION

For all the foregoing reasons, defendants' Motion for Summary Judgment is GRANTED and plaintiffs' Cross-Motion for Summary Judgment is DENIED. A separate Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge